**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

            v.

MALIK SMITH,
            *Defendant-Appellant.*

No. 05-50375

D.C. No.
CR 03-728-PA

ORDER
AMENDING
OPINION AND
AMENDED
OPINION

Appeal from the United States District Court
for the Central District of California
Percy Anderson, District Judge, Presiding

Argued and Submitted
December 17, 2008—Pasadena, California

Filed March 24, 2009
Amended April 9, 2009

Before: Alex Kozinski, Chief Judge, Mary M. Schroeder,
Stephen Reinhardt, Andrew J. Kleinfeld,
Michael Daly Hawkins, Susan P. Graber,
Kim McLane Wardlaw, Ronald M. Gould, Richard A. Paez,
Marsha S. Berzon, and Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Hawkins;
Dissent by Judge Berzon

4323

## COUNSEL

Davina T. Chen, Deputy Federal Public Defender (authored briefs and presented oral argument), Los Angeles, California, for the defendant-appellant.

Erik Michael Silber, Assistant United States Attorney (presented oral argument), and Craig H. Missakian, Assistant United States Attorney (authored brief), Los Angeles, California, for the plaintiff-appellee.

## ORDER

The Opinion filed March 24, 2009, slip op. 3735, is hereby amended as follows:

1. On page 3745, line 13: "substantial" is replaced with "serious"

2. On page 3745, line 13: "113" is replaced with "113(b)(2)"

3. On page 3745, line 14: "substantial" is replaced with "serious"

4. On page 3745, line 16: "means" is replaced with "is any harm that involves"

5.  On page 3746, lines 18-20: "(Because the evidence established as much, she explained, she did not raise a sufficiency of the evidence claim on appeal.)" is deleted

6.  On page 3746, footnote 4, line 10: "on appeal" is replaced with "in these proceedings by competent counsel"

The "Petition for Additional Rehearing by Limited En Banc Panel" remains pending and will be disposed of in a separate Order.

---

**OPINION**

HAWKINS, Circuit Judge:

We primarily consider whether a jury instruction impermissibly relieved the government of its burden to prove beyond a reasonable doubt that the defendant used a "dangerous weapon" and whether any error in the instruction was harmless. A panel of our court held that the jury instruction was not defective and affirmed the defendant's conviction. *United States v. Smith*, 520 F.3d 1097 (9th Cir. 2008). We subsequently granted rehearing en banc.

Although we hold there was a "reasonable likelihood" the trial judge's instructions "misled" the jury to think they did not have to determine beyond a reasonable doubt that the defendant used a dangerous weapon, *see Middleton v. McNeil*, 541 U.S. 433, 437 (2004) (per curiam), we nevertheless affirm Smith's conviction because we "conclude that it is 'clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error.' " *United States v. Gracidas-Ulibarry*, 231 F.3d 1188, 1197 (9th Cir. 2000) (en banc) (quoting *Neder v. United States*, 527 U.S. 1, 18 (1999)).

Smith also challenges his sentence. Concluding that the district court erred in delegating its statutory duties and applying the Sentencing Guidelines to the facts of this case, we vacate Smith's sentence and remand for further sentencing proceedings consistent with this Opinion.

## I.

## A.

Prison officials at the federal penitentiary in Lompoc, California, found Charles Helem holding George Jeffries from behind while Malik Smith was stabbing Jeffries with a prison-made knife. The knife used in the assault was a flat, six-inch-long "shank" fashioned from melted plastic dishware. It was hard and sharpened to a point. Although the prison-made knife broke in two under the force of the stabbing, Smith continued to strike Jeffries with one of the pieces until Jeffries broke away.

After the altercation, the three inmates were examined by Reynaldo Nisperos, a physician's assistant at the prison. Nisperos—a twenty-year veteran of the Bureau of Prisons who has treated between fifty and one hundred prison stabbings—found no injuries on Helem and only minor abrasions on Smith's hands and lower lip. His examination of Jeffries, however, revealed "very extensive injur[ies]," including: a "ten centimeters," "full-skin thick" laceration on Jeffries's right eyelid; an "eight centimeters full-skin thickness laceration" on the left parietal region of his head; a third, less serious laceration; superficial abrasions on his neck and right knee; and several "abrasions and lacerations" of varying sizes on his lower back. Nisperos provided first aid to both Smith and Jeffries for their injuries.

After the incident, the prison punished Smith for assault and possession of a sharpened instrument, imposing 120 days of disciplinary segregation and deducting 360 visitor days and

80 days of good conduct time. Smith was subsequently released from prison in 2002.

**B.**

After his release, Smith was charged in connection with the prison fight with "Assault with intent to commit murder," in violation of 18 U.S.C. § 113(a)(1), and "Assault with a dangerous weapon, with intent to do bodily harm," in violation of 18 U.S.C. § 113(a)(3). At trial, Lieutenant Jaime Bengford testified that the prison-made knife had been made by accumulating and melting down plastic meal trays to create a "weapon." Testifying as a medical expert,[1] Nisperos explained to the jury the severity of Jeffries's injuries, describing them as "very extensive" and detailing the locations of the specific wounds. When subsequently asked whether, "in your opinion, based on your experience, if someone was stabbed in a vital organ with that prison-made knife, could that injury be fatal," Nisperos testified that the prison-made knife "could cause very fatal injuries." Smith never challenged, on cross-examination or at any other time before the jury, Nisperos's conclusions that the prison-made knife *did* cause "very extensive" injuries, including a skin-deep laceration on Jeffries's eyelid, or that it *could have* caused fatal injuries.

At the conclusion of trial, the court instructed the jury on assault with intent to commit murder, assault with a dangerous weapon, and the lesser-included offense of simple assault. Tracking this circuit's then-current Model Criminal Jury Instruction 8.5, the trial court instructed the jury on assault with a dangerous weapon as follows:

> The defendant is charged in Count 2 of the indict-

---

[1]Smith challenged Nisperos's certification as a medical expert at trial and before the initial three-judge panel of this court. The panel upheld the certification, and Smith has not raised the issue on petition for rehearing.

ment with assault with a dangerous weapon, in violation of Section 113(a)(3) of Title 18 of the United States Code.

In order for the defendant to be found guilty of that charge, the Government must prove each of the following elements beyond a reasonable doubt: First, the defendant intentionally struck or wounded George Jeffries; second, the defendant acted with the specific intent to do bodily harm to George Jeffries; *and, third, the defendant used a prison-made knife*.

A prison-made knife is a dangerous weapon if it is used in a way that is capable of causing death or serious bodily injury.[2]

(Emphasis added.) Smith objected to the instructions, contending that the third element usurped the jury's role as finder of fact as to whether the knife qualified as a "dangerous weapon."

The jury acquitted Smith of attempted murder but convicted him of assault with a dangerous weapon. The court sentenced Smith to 100 months in prison to run consecutively with his undischarged term of imprisonment, followed by three years of supervised release. Smith timely appealed, arguing in part that the district court's jury instruction had improperly charged the jury to find only that Smith committed assault with a *prison-made knife*, rather than assault with *a dangerous weapon*, effectively relieving the government of the burden to prove the prison-made knife was a dangerous weapon.

---

[2]Model Criminal Jury Instruction 8.5 has since been amended to correct the defect raised by this appeal. As of April 2008, that instruction now requires the jury to find "[t]hird, the defendant used *a dangerous weapon*" and explains that a particular object "is a dangerous weapon if it is used in a way that is capable of causing death or serious bodily injury." 9th Cir. Model Crim. Jury Instr. 8.5 (2008) (emphasis added).

## II.

### A.

We review de novo the legal sufficiency of jury instructions. *United States v. Romo-Romo*, 246 F.3d 1272, 1274 (9th Cir. 2001).

### B.

**[1]** "[T]he Due Process Clause of the Fourteenth Amendment requires that the prosecution prove beyond a reasonable doubt every fact necessary to establish each element of the crimes charged." *Mejia v. Garcia*, 534 F.3d 1036, 1042 (9th Cir. 2008) (citing *In re Winship*, 397 U.S. 358, 364 (1970)), *cert. denied*, 129 S. Ct. 941 (2009). A defendant is therefore deprived of constitutional due process when the jury is not properly instructed that the government bears the burden of proving guilt beyond a reasonable doubt on each element of the crime. *Middleton*, 541 U.S. at 437. Here, the trial court stated that to support a conviction, the jury needed to find "the defendant used a prison-made knife." Although the court then defined under what circumstances a prison-made knife constitutes a dangerous weapon, the instructions did not unambiguously require the jury to find the prison-made knife was, in fact, a dangerous weapon. We therefore conclude there is a "reasonable likelihood" the trial judge's instructions "misled" the jury to believe they did not have to determine beyond a reasonable doubt that the prison-made knife was a dangerous weapon.

**[2]** Not all constitutional errors require reversal, however. The Supreme Court has specifically recognized that omitting an offense element from a jury instruction is " 'simply an error in the trial process itself' " and not a " 'defect affecting the framework within which the trial proceeds.' " *Neder*, 527 U.S. at 8 (quoting *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991)). Because such an error is not "structural," it "does not

*necessarily* render a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence." *Id.* at 8-9.

Non-structural constitutional errors like the one at issue here are therefore subject to harmless error review. *See Chapman v. California*, 386 U.S. 18 (1967). When "a reviewing court concludes beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error, the erroneous instruction is properly found to be harmless." *Neder*, 527 U.S. at 17; *see also Gracidas-Ulibarry*, 231 F.3d at 1197 (error is harmless if "we conclude that it is 'clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error' " (quoting *Neder*, 527 U.S. at 18)). If the error is harmless, we will affirm the conviction regardless of whether the instruction omitted or incorrectly described an element of the offense. *See Neder*, 527 U.S. at 9-10; *cf. United States v. Larson*, 495 F.3d 1094 (9th Cir. 2007) (en banc) (affirming despite an acknowledged Confrontation Clause error because the error was harmless), *cert. denied*, 128 S. Ct. 1647 (2008).

Notwithstanding the defect in the trial court's instructions —and based on the evidence and argumentation actually presented to the jury—we hold it is clear beyond a reasonable doubt that any rational jury would have found Smith guilty even absent the error.

**[3]** An object is a dangerous weapon within the meaning of 18 U.S.C. § 113(a)(3) if it is either "inherently dangerous" or otherwise " 'used in a manner likely to endanger life or inflict great bodily harm.' " *United States v. Riggins*, 40 F.3d 1055, 1057 (9th Cir. 1994) (quoting *United States v. Guilbert*, 692 F.2d 1340, 1343 (11th Cir. 1982) (per curiam)) (finding a "belt" and a "shoe" to be dangerous weapons given "the manner in which the object[s] w[ere] used"). Inherently dangerous weapons, or " 'dangerous weapons *per se*,' " are " 'obviously

dangerous' " objects such as " 'guns, knives, and the like.' " *Id.* (quoting *Guilbert*, 692 F.2d at 1343). Although we have not previously defined "great bodily harm," we find guidance in the definition of "serious bodily injury" in § 113(b)(2) (incorporating by reference the definition of "serious bodily injury" in § 1365(h)). Therefore, we hold that "great bodily harm" is any harm that involves "(A) a substantial risk of death; (B) extreme physical pain; (C) protracted and obvious disfigurement; or (D) protracted loss or impairment of the function of a bodily member, organ, or mental faculty." *See* 18 U.S.C. §§ 113(b)(2), 1365(h)(3).

**[4]** Here, "overwhelming and uncontradicted evidence at trial" indicated both that the prison-made knife was inherently dangerous *and* that it was used in a manner that risked great bodily harm to Jeffries. *See United States v. Hollis*, 490 F.3d 1149, 1157 (9th Cir. 2007) (holding that jury instruction errors are harmless when there is "overwhelming and uncontradicted evidence at trial" concerning the omitted element).

**[5]** It is undisputed that the knife was formed by melting Styrofoam meal trays into a hard, flat, six-inch-long shank, which was sharpened to a dagger-like point. Nisperos provided uncontradicted expert testimony that the knife *did* cause "full skin thickness" lacerations about Jeffries's head and face, and that it *could have* caused "very fatal injuries." Smith did not challenge these expert conclusions on cross-examination and, as his counsel conceded at oral argument, entered no evidence at trial to rebut a conclusion that the shank was a dangerous weapon. There is therefore no reasonable doubt that any rational jury would have found that the prison made knife at issue here—designed for, and capable of, inflicting great bodily harm—was an inherently dangerous weapon within the meaning of 18 U.S.C. § 113(a)(3).

**[6]** It is also clear beyond a reasonable doubt that any rational juror would have found Smith used the prison-made knife in a manner likely to inflict extreme physical pain, cause

obvious disfigurement, or impair the function of a bodily organ. While Jeffries did not require hospitalization, he sustained "very extensive injur[ies],"[3] including two lacerations penetrating the entire thickness of his skin about his head and face. He also nearly lost an eye: Smith's counsel conceded at oral argument that the evidence established that the ten centimeters long laceration within the fold of Jeffries's inner eyelid was caused by the shank and that, if Smith's stroke had "been more precisely targeted," Jeffries could have lost the eye and thereby sustained serious bodily injury.[4] Given the evidence before the jury regarding the severity and location of Jeffries' injuries, it is clear beyond a reasonable doubt that any rational juror would have found that Smith's specific use of the prison-made knife was capable of causing serious bodily injury.

[7] Whether the jury found Smith did not intend to kill Jeffries,[5] and whether Smith did in fact inflict great bodily harm

---

[3]Although Nisperos checked a box on his incident report indicating that Jeffries's extensive injuries required only "minor first aid," his testimony indicates that if a patient does not have "a lot of blood loss [or] organ damage" requiring "outside hospital[ization]," the patient will be treated at the prison with "minor first aid," including, for example, the suturing of lacerations. The only reasonable inference to be drawn from the incident report, therefore, is that Jefferies's injuries were not so severe that he required emergency hospital care for extreme blood loss or organ damage.

[4]While Smith's appellate counsel's admission does not constitute evidence in the record, it does constitute a concession *about* the evidence in the record: that it left the jury with no reasonable doubt that the shank caused the injury on Jeffries's eyelid. This conclusion has never been disputed at any point in the long history of this case. Thus while we agree with the dissent's characterization of "[o]ur task in conducting the harmless error analysis" here, [Dissent at 4342 n.2], we note further that the task requires us to refrain from conjuring factual disputes that were never presented to the jury, that are unsupported by the evidence, and that have accordingly been waived in these proceedings by competent counsel. We must consider the trial Smith actually had, and not one he might hypothetically receive on remand.

[5]Smith's acquittal on the attempted murder charge does not suggest the jury "did not believe that the object was *used* in the manner the prosecutor

within the meaning of the law, are both immaterial to whether Smith used the shank in a manner that *made it likely* that Jeffries would suffer such harm. As the dissent itself acknowledges, "Smith struck him with a sharpened object in a downward motion with a high degree of force" about his face, head, and shoulders, [Dissent at 4342], causing, in Nisperos's words, "very extensive injur[ies]." Those injuries demonstrate that Smith used the shank in a manner that seriously risked blinding Jeffries in his right eye and otherwise inflicting extreme physical pain. *See Riggins*, 40 F.3d at 1057 (belt and shoe were dangerous weapons where defendant beat child "as hard as she could" and expert testified victim could have suffered severe injury or death, despite fact that victim "only suffered welts and bruises"). The overwhelming and uncontradicted evidence therefore leaves no doubt that Smith's use of the weapon was " 'likely to . . . inflict great bodily harm' " upon Jeffries. *Id.* at 1057 (quoting *Guilbert*, 692 F.2d at 1343).

Smith nevertheless argues the error in the jury instructions was not harmless because the evidence demonstrating the prison-made knife was a dangerous weapon was both "underwhelming" and "contested." Neither claim is persuasive. Although Smith contested Nisperos's certification as an expert, he never once challenged any of Nisperos's unambiguous expert opinions about the nature of the shank or the extent of Jeffries's injuries.

Smith points to Lieutenant Bengford's testimony that the *unaltered Styrofoam food trays* from which the shank was

suggested or that it did not believe that the object was, as Nisperos testified, capable of causing 'very fatal injuries' (or both)." [Dissent at 4344]. Smith's acquittal of "Assault with intent to commit murder," 18 U.S.C. § 113(a)(1), coupled with his *conviction* for "Assault with a dangerous weapon, with intent to do bodily harm," 18 U.S.C. § 113(a)(3), demonstrates only that the jury did not believe he intended to *kill* Jeffries. It says nothing at all about either the latent capabilities of the prison-made knife or whether it was used in a manner likely to inflict great bodily harm.

fashioned were "thin, very thin plastic" and "would not be perceived as a possible weapon or a potential weapon" to argue the jury could have found the shank was not a dangerous weapon. But this testimony was unambiguously elicited for the purpose of casting doubt on whether Smith had himself melted the trays *to create* the shank, not whether the shank was indeed a dangerous weapon. In fact, the exchange between Smith's counsel and the prison official on this issue concluded as follows:

> Q:  [W]as [there] evidence consistent with creating a weapon in Mr. Smith's cell . . . ?
>
> A:  . . . . So, no, if a tray was—because they're thin, very thin plastic, these common-fare trays, where the meat item comes in. It's only about a three-by-five-inch piece of plastic. So it's not considered, in itself, as a potential weapon.
>
> Q:  *But when it's melted down or burnt, it is a weapon; correct?*
>
> A:  *When you accumulate a few of those, you could put them together and melt it down into a weapon, yes.*
>
> Q:  Okay. And in this case, there was no evidence that was consistent or showed that Mr. Smith had created this weapon in his cell; correct?

(Emphasis added.) Thus not only did Smith never submit any evidence or argue before the jury that the prison-made knife was not a dangerous weapon, but his counsel's questions assumed (if not conceded) that it was a "weapon." In fact, throughout the entire three-day trial, Smith's counsel consistently referred to the implement at issue here as a "knife" and

a "shank"—words that both colloquially connote inherent dangerousness.**[6]**

## C.

**[8]** In the absence of any evidence or argument before the jury to contest the government's overwhelming case, it is clear beyond a reasonable doubt that any rational juror would have found the prison-made knife was a dangerous weapon within the meaning of 18 U.S.C. § 113(a)(3), regardless of whether the jury instructions were constitutionally defective.

## III.

## A.

Smith also challenges the terms and conditions of his sentence. " 'We review de novo the district court's interpretation of the United States Sentencing Guidelines, review for clear error the district court's factual determinations, and review for abuse of discretion the district court's applications of the Guidelines to the facts.' " *United States v. Gomez-Leon*, 545 F.3d 777, 782 (9th Cir. 2008) (alteration omitted) (quoting *United States v. Holt*, 510 F.3d 1007, 1010 (9th Cir. 2007)). "We must reverse if the district court committed a significant procedural error, such as incorrectly calculating the advisory Guidelines' sentencing range." *Id*. at 782-83 (citing *Gall v. United States*, 128 S. Ct. 586, 597 (2007); *United States v. Carty*, 520 F.3d 984, 991-93 (9th Cir.) (en banc), *cert. denied*, 128 S. Ct. 2491 (2008)).

---

**[6]***See Webster's New International Dictionary* 1249, 2087, 2589 (3d ed. 2002) (defining a "knife" as "a [weapon] consisting of a sharp-edged blade provided with a handle"; a "weapon" as "something (as a club, sword, gun, or grenade) used in destroying, defeating, or physically injuring an enemy"; and a "shank" as a "knife").

**B.**

**[9]** As a condition of his supervised release, Smith was required to submit to an unspecified number of non-treatment drug tests. The district court did not state the maximum number of drug tests Smith was required to take, and the government concedes that this failure constituted an impermissible delegation of the court's statutory duty under 18 U.S.C. § 3583(d). *See United States v. Stephens*, 424 F.3d 876, 883-84 (9th Cir. 2005).[7]

**[10]** Smith argues further that the district court applied the wrong standard to his request for concurrent, rather than consecutive, sentences. The government has also conceded that the district court erroneously consulted U.S.S.G. § 5G1.3(a), rather than U.S.S.G. § 5G1.3(c), when it denied Smith's request for concurrent sentences. Because "the sentence imposed . . . [was] a result of an incorrect application of the Guidelines," and we cannot say that "the error did not affect the district court's selection of the sentence imposed," a "remand is required under § 3742(f)(1)." *Williams v. United States*, 503 U.S. 193, 202-03 (1992).

Accordingly, we **AFFIRM** Smith's conviction, **VACATE** the sentence imposed, and **REMAND** for resentencing as to the conditions of his supervised release and the decision to impose Smith's sentence concurrently, partially concurrently, or consecutively to his undischarged term of imprisonment.

**Conviction AFFIRMED; sentence VACATED; REMANDED for resentencing.**

---

[7]Our conclusion here has no bearing on the continued validity of *United States v. Garcia*, 522 F.3d 855 (9th Cir. 2008), where the district court directed one of the defendants to " 'submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, *as determined by the court*.' " *Id.* at 860 (emphasis added). Here, as in *Stephens*, the number of tests was to be set "by the probation officer." *Stephens*, 424 F.3d at 883.

BERZON, Circuit Judge, with whom SCHROEDER, REINHARDT, WARDLAW, and PAEZ, Circuit Judges, join, dissenting:

I agree with the majority that the jury instructions given in this case were erroneous, because they relieved the government of its burden of proving that the object in question was a "dangerous weapon" within the meaning of the federal assault statute. The given instructions purported to define "dangerous weapon," but, critically, failed to instruct the jury that it must find, as an element of the offense — and, therefore, beyond a reasonable doubt — that Smith used a dangerous weapon. Given that error and the trial record, I cannot agree with the majority that it is clear beyond a reasonable doubt that a rational jury would have returned the same verdict had a proper instruction been given. *See Chapman v. California*, 386 U.S. 18, 23 (1967). I therefore respectfully dissent.

We have held that an object is a "dangerous weapon" within the meaning of 18 U.S.C. § 113(a)(3) if it is "dangerous *per se*" or "used in a manner likely to endanger life or inflict great bodily harm."[1] *United States v. Riggins*, 40 F.3d

---

[1] I am not at all sure that this standard is an appropriate interpretation of the statute. Were the issue before us, I would probably conclude that a "dangerous weapon" must be an object *designed* to injure someone through the use of force, not an object — like a shoe or a pot or a chair — that *could* seriously injure someone but is not meant for or likely to be used for that purpose. *Cf. Medley v. Runnels*, 506 F.3d 857, 863-64 (9th Cir. 2007) (en banc) (recognizing that the California statute in question requires that a "firearm" be "designed to be used as a weapon"). It seems evident to me that a "weapon" describes a specific *kind* of object, not *any* object that can injure someone. Congress's purpose in providing an enhancement for use of a dangerous weapon, I would likely conclude, was to deter possession of, access to, and use of objects particularly dangerous in themselves, not the use of everyday objects that are not meant as objects of violence but can be used for that purpose. In other words, Congress wanted to deter people from having and using guns, switchblades, and

1055, 1057 (9th Cir. 1994) (quoting *United States v. Guilbert*, 692 F.2d 1340, 1343 (11th Cir. 1982)). For objects that cannot "obviously" be described as dangerous, *Riggins*, 40 F.3d at 1057, then, a conviction under § 113(a)(3) must rest not on the object's abstract capabilities, but instead on evidence that the accused used the object during the commission of an assault in a seriously endangering manner. We have therefore emphasized that determining whether an object was so used in a particular case is a fact-intensive inquiry reserved for the jury. *See id.*

The erroneous jury instructions removed this critical — and dispositive — issue of fact from the jury. Smith's defense at trial questioned the dangerousness of the Styrofoam "prison-made knife" by attacking its inherent capabilities, by emphasizing the relatively minor extent of the injuries it allegedly caused, and by contesting the prison guard witnesses' version of how it was used. Unlike the majority, I cannot say that the evidence of the object's dangerousness, either inherently or as it was used, was so overwhelming that the jury instructions' failure to direct the jury to decide this critical issue of fact was harmless beyond a reasonable doubt.

If anything, the bulk of the testimony at trial reasonably suggested that the prison-made knife, as used during the altercation, was *unlikely* to cause serious bodily injury. The jury

---

brass-knuckles, but not from wearing shoes, cooking in pots, or sitting in chairs and then deciding to use them to hurt someone. The use of everyday objects to exert additional force does not seem sufficiently different from throwing a good punch to come within the statutory language or Congress's purpose.

There has been no direct challenge in this case, however, to the *Riggins* line of cases holding otherwise. Also, an appropriately instructed jury probably could have found that the prison-made knife falls on the "dangerous weapon" side of the line I suggest, as it was at least *designed* to inflict injury, whether capable of doing so or not. I therefore do not dissent on this ground.

heard from two correctional officers who observed the fight in the prison yard. Both officers testified that while Jeffries was restrained, Smith struck him with a sharpened object in a downward motion with a high degree of force. One officer offered a more specific account: he testified that Smith struck Jeffries in the small of his back "really forcefully . . . it looked like he was putting all of his effort into it." But the testimony also was that the object broke under that pressure and that, despite Smith's use of his utmost force, the injuries to Jeffries's back required only minor first aid. Defense counsel emphasized this point at closing. Thus, it would have been reasonable for the jury to conclude that the object, even when used as violently as possible, was capable of causing only minor injuries.

True, Jeffries's physical examination after the incident revealed a laceration on his right eyelid. There was *no* testimony, however, that Smith directed the prison-made knife towards Jeffries's face, nor any testimony, from Nisperos, the medical examiner, or any one else, that Jeffries "nearly lost an eye."[2] Maj. Op. at 4335. Nor, contrary to the majority's

---

[2]Unlike the majority, I do not understand Smith's appellate counsel's statements at oral argument as concessions about the jury's likely understanding of the record in this case, and would not rely on them even if I did so understand them. Our task in conducting the harmless error analysis is to determine whether every member of the jury hearing the evidence in this case would have concluded, beyond a reasonable doubt, that Smith used the prison-made knife in a manner likely to inflict great bodily harm. *See Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993) ("[T]he question [*Chapman*] instructs the reviewing court to consider is not what effect the constitutional error might generally be expected to have upon a reasonable jury, but rather what effect it had upon the guilty verdict in the case at hand."). For that reason, Smith's appellate counsel's statements, made nine years after the fact, are irrelevant to our inquiry, as they reflect only her assessment of the same trial evidence before us now. Neither her characterization of the testimony, nor, for that matter, any post-trial factual concession about what actually happened during the altercation, bear on our task. The only question posed is whether this jury, in *its* assessment of the trial evidence, would have reached the verdict of guilty beyond a reasonable doubt had a correct instruction been given.

account, *see* Maj. Op. at 4330, 4334, did Nisperos testify that the injuries to Jeffries's eyelid resulted from the prison-made knife or the use of any other sharp object. In fact, the medical term Nisperos used to describe the injury, "laceration," signifies "a torn or jagged wound," as opposed to a clean cut, suggesting that the wound was not inflicted by a sharp object. *See PDR Medical Dictionary* 958 (2d ed. 2000); *see also* http://www.healthatoz.com/healthatoz/Atoz/common/standard/transform.jsp?requestURI=/healthatoz/Atoz/ency/wounds.jsp (distinguishing "cuts," "slicing wounds made with a sharp instrument," from "lacerations," which are "produced by a tremendous force against the body . . . from an external source like a punch"). There was testimony that in addition to striking Jeffries with the sharpened object, Smith struck him with his clenched fist. The photographic depiction of Jeffries's injury, from my lay perspective, reveals nothing more than a pool of blood above his right eye, hardly a showing sufficient to support the conclusion that a stabbing is the only plausible explanation for the injury. The jury reasonably could have concluded, instead, that the injury to the eyelid was the result of punches thrown by Smith, not of the prison-made knife.

In short, in the absence of any testimony establishing that Smith directed the prison-made knife toward Jeffries's eye, I cannot conclude that it is clear beyond a reasonable doubt that, had they been properly instructed, every member of the jury would have found beyond a reasonable doubt that Smith used the object in a manner likely to cause great bodily harm.

The medical examiner's testimony that the object "could cause very fatal injuries" does not convince me otherwise. Nisperos, a medical professional who had twice failed the American medical doctor board exams and had never before testified as a forensic expert, testified that the object could cause fatal injuries if directed at a vital organ. The jury could well have decided not to rely on Nisperos's opinion, given his less-than-impressive medical background, the vagueness of his testimony about the dangerousness of the object, and the

contradiction between his very general assertion and the record fact that the object broke when used on the victim's back, after causing no more than minor lacerations.

Moreover, Nisperos's testimony is only marginally pertinent to the facts of this case, because there was paltry evidence that Smith attacked Jeffries in any vital organ. Defense counsel stressed this point in closing argument, in part to defend against the attempted murder charge. As the definition the jury should have been given focuses on how the object was *used*, the jury could have viewed Nisperos's testimony as off-to-the-side on the facts of this case.

Tellingly, the jury acquitted Smith on the attempted murder charge, suggesting either that it did not believe that the object was *used* in the manner the prosecutor suggested or that it did not believe that the object was, as Nisperos testified, capable of causing "very fatal injuries" (or both). Either way, the jury's actual verdict indicates that it did not believe a great deal of the evidence the majority relies on as indisputably supporting the assault with a dangerous weapon verdict.

Finally, although Smith's counsel, as well as the prosecutors, referred to the object as a "weapon" and a "knife," the jury was required to find that the object is a "*dangerous* weapon," not just any weapon. As the majority observes, the use of such words *may* connote dangerousness, but this observation only highlights the prejudicial effect of failing to give a correct jury instruction on dangerousness. Under the case law, dangerousness is a critical question for the jury, not for counsel or the court.

I cannot conclude that the failure to give the correct instruction on dangerousness was harmless beyond a reasonable doubt. I respectfully dissent.