**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

            v.

MICHAEL DION ANCHRUM,
            *Defendant-Appellant.*

No. 09-30013

D.C. No.
3:06-CR-00085-
TMB

OPINION

Appeal from the United States District Court
for the District of Alaska
Timothy M. Burgess, District Judge, Presiding

Submitted December 9, 2009*
Seattle, Washington

Filed December 30, 2009

Before: Robert R. Beezer, Ronald M. Gould, and
Richard C. Tallman, Circuit Judges.

Opinion by Judge Tallman

---

*The panel unanimously finds this case suitable for decision without
oral argument. *See* Fed. R. App. P. 34(a)(2).

## COUNSEL

Michael D. Dieni, Esq., Assistant Federal Defender, Anchorage, Alaska, for defendant-appellant Anchrum.

Christine M. Thoreson, Esq., Special Assistant United States Attorney, Anchorage, Alaska, for plaintiff-appellee United States of America.

## OPINION

TALLMAN, Circuit Judge:

Defendant-Appellant Michael Anchrum ("Anchrum") appeals a jury conviction and sentence for one count of possession of controlled substances with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(c), two counts of assault on federal officers with a deadly or dangerous weapon in violation of 18 U.S.C. §§ 111(a)(1) and (b), and one count of possession of firearms in furtherance of drug trafficking in violation of 18 U.S.C. § 924(c)(1)(A)(i). Anchrum claims (1) that the jury instruction on the assault counts erroneously required the jury to find that he used a "motor vehicle" instead of a "deadly or dangerous weapon," (2) that the government's use of United States Drug Enforcement Administration ("DEA") Special Agent Kenneth Solek ("Agent Solek") as both a lay and expert witness resulted in testimony inconsistent with this court's holding in *United States v. Freeman*, 498 F.3d 893, 904 (9th Cir. 2007), as well as Federal Rule of Evidence ("Rule") 704(b), and (3) that the district court erred in applying a six-level official victim enhancement at sentencing under U.S. Sentencing Guidelines ("U.S.S.G.") § 3A1.2(c)(1).

We have jurisdiction pursuant to 28 U.S.C. § 1291, there was no prejudicial error, and we affirm.

## I

On October 26, 2006, a United States postal inspector observed a suspicious parcel at the United States Post Office in Anchorage, Alaska. The package was addressed to an "M. Johnson" at an address on Old Seward Hwy in Anchorage, Alaska. The return address, "Jason Johnson, 423 Market # 21, Inglewood, CA 90302," was fictional. The inspector noticed several indices of drug trafficking, including the use of Express Mail, handwritten labels, and a lack of telephone

numbers. Upon submission of the package to a drug detection canine, the dog alerted.

Following the execution of a search warrant, agents from the DEA found one-quarter kilogram of cocaine and one ounce of heroin in the package. The package was legally wired with a tracking device pursuant to a "beeper order," packed with a representative amount of cocaine and heroin, resealed, and delivered by an undercover agent posing as a postal delivery person the next day. Anchrum accepted the package at the delivery address by producing a California driver's license bearing the name "Marcus Johnson." He then left the delivery address in a Ford Focus, followed by investigators in unmarked police cars.

Anchrum soon observed the investigators following him. He then began driving erratically—cutting across several lanes of traffic and making an abrupt u-turn—in an attempt to evade his pursuers. A chase ensued. DEA Agents and Task Force Officers activated their emergency lights and sirens in an attempt to stop Anchrum. At one point during the pursuit, Agent Solek and his partner pursued Anchrum down a side street that ended in a "gravel pit area."

Agent Solek attempted to block Anchrum's exit by parking his vehicle at an angle on the side street. Anchrum turned his vehicle around, aimed it at Agent Solek, and came to a stop. Agent Solek exited his vehicle. He was wearing a black raid vest with large yellow letters reading "Police." Anchrum and Agent Solek made eye contact. Agent Solek drew his sidearm, began walking toward Anchrum's vehicle, and yelled at Anchrum to "get his hands up." While the two men were approximately twenty feet apart and still making eye contact, Anchrum gripped his steering wheel and slammed on the gas pedal, kicking up gravel and heading straight for Agent Solek. Agent Solek testified, "I was in fear that I was about to get run over."[1] He dove out of the way, trying to take cover

---

[1]He also testified, "I had to make a decision on whether to try to incapacitate the driver, shoot the driver, or get out of the way. In my experi-

behind the front of his vehicle, but was struck on his right knee as Anchrum sped away.

A message was broadcast over police radio that Anchrum had struck an officer with his vehicle. Despite being pursued by an increasing number of DEA agents and local police officers, Anchrum continued to lead authorities on the high speed chase.

Task Force Officer Gamache ("Officer Gamache") picked up the pursuit soon after Anchrum struck Agent Solek with his vehicle. Officer Gamache eventually followed Anchrum down yet another dead-end side street. Officer Gamache stopped his police car—with red and blue lights flashing and siren blaring—in Anchrum's path, trying to block his exit from the side street. Anchrum accelerated his Ford Focus and hit Officer Gamache's police car. Anchrum's vehicle was traveling with enough speed to cause his car to go into a "spinout." When Anchrum's vehicle came to a stop, he exited and fled on foot. He was apprehended after a short foot pursuit through an industrial park.

Anchrum's person and vehicle were searched. The searches produced two California driver's licenses, one bearing his true name of Michael Dion Anchrum, and one bearing the false name of Marcus Johnson. Agents found a loaded .45 caliber-semi automatic pistol on the driver's side floorboard of Anchrum's vehicle and a loaded .357 magnum revolver under the driver's seat. Agents also found a digital scale, the package containing the representative sample of the cocaine and heroin, as well as the tracking device.

---

ence and what I believed was going to happen is that if I were to shoot the driver, then there's no guarantees that the vehicle was going to stop anyhow and I'd still get struck, except I would get struck head-on as opposed to you know, dead center, as opposed to maybe taking a glancing blow. So therefore I decided to try to jump out of the way and—and continue on that way, which seemed to be the best choice."

At trial, Agent Solek testified as both a percipient and expert witness. The district court separated the testimony into a first "phase," consisting of Agent Solek's percipient witness testimony regarding the investigation and arrest of Anchrum, and a second "phase," consisting of Agent Solek's expert qualifications as a drug investigator and his opinions that drug dealers usually possess guns for protection, use scales to weigh drugs, and rent cars to avoid detection. A sidebar conference separated the two phases of the agent's testimony. Following the end of the percipient witness portion of testimony and the sidebar, the prosecutor transitioned into the expert phase by stating "Agent Solek, I'd like to shift gears here a little bit and talk about some of your education, professional training, and law enforcement experience."

The jury convicted Anchrum on all counts. At sentencing, the district court applied a six-level enhancement based on the fact that Agent Solek was an "Official Victim" under U.S.S.G. § 3A1.2. Anchrum timely appealed.

## II

A jury instruction that erroneously misstates or omits an element of the offense is a non-structural constitutional error subject to harmless error review. *See United States v. Smith*, 561 F.3d 934, 938 (9th Cir. 2009) (en banc). "A defendant is . . . deprived of constitutional due process when the jury is not properly instructed that the government bears the burden of proving guilt beyond a reasonable doubt on each element of the crime." *Id.* (citing *Middleton v. McNeil*, 541 U.S. 433, 437 (2004)).

In relevant part, 18 U.S.C. § 111(a)(1) provides, "Whoever . . . forcibly assaults, resists, opposes, impedes, intimidates, or interferes with any person designated in section 1114 of this title while engaged in or on account of the performance of official duties . . . shall . . . where such acts involve physical contact with the victim of that assault . . . be . . . imprisoned

not more than 8 years . . . ." However, 18 U.S.C. § 111(b) provides, "Whoever, in the commission of any acts described in subsection (a), uses a deadly or dangerous weapon (including a weapon intended to cause death or danger but that fails to do so by reason of a defective component) or inflicts bodily injury, shall be . . . imprisoned not more than 20 years . . . ."

**[1]** An element of assault on a federal officer with a deadly or dangerous weapon is therefore the use of a "deadly or dangerous weapon." *Id.* At the time of Anchrum's trial, the relevant Ninth Circuit Model Criminal Jury Instruction for Assault on a Federal Officer with a Deadly or Dangerous Weapon in violation of 18 U.S.C. § 111(b) read:

> In order for the defendant to be found guilty of that charge, the government must prove each of the following elements beyond a reasonable doubt:
>
> First, the defendant intentionally used force in [[assaulting] [resisting] [intimidating] [interfering with]] [[_____]]; and
>
> Second, the defendant did so while [_____] was engaged in, or on account of [his] [her] official duties [; and]
>
> [Third, the defendant [used a [_____]] [inflicted bodily injury]].
>
> [A [_____] is a dangerous or deadly weapon if it is used in a way that is capable of causing death or serious bodily injury.]

9th Cir. Crim. Jury Instr. 8.2 (2003). Accordingly, the district court gave the following instruction:

> In order for the defendant to be found guilty of that charge, the government must prove each of the following elements beyond a reasonable doubt:

> First, the defendant intentionally used force in assaulting, resisting, intimidating or interfering with Drug Enforcement Agent Kenneth Solek;
>
> Second, the defendant did so while Agent Solek was engaged in official duties;
>
> Third, the defendant used a motor vehicle.
>
> A motor vehicle is a dangerous or deadly weapon if it is used in a way that is capable of causing death or serious bodily injury.

**[2]** Anchrum aptly argues that this instruction was deficient because it relieved the government of its burden to prove that the defendant used a "dangerous or deadly weapon." Under this instruction, in order to find Anchrum guilty the jury was not required to find that his motor vehicle was used in a way that was capable of causing death or serious bodily injury, it was only required to find that Anchrum used a motor vehicle. The instruction therefore erroneously omitted an element of the crime.

In light of this court's *en banc* decision in *Smith*, 561 F.3d at 938, the government concedes the instruction was erroneous. In *Smith*, the defendant was charged with assault with a dangerous weapon. *Id.* at 937. The district court in that case gave a jury instruction based on Ninth Circuit Model Criminal Jury Instruction 8.5. *Id.* That instruction included a third element similar to the one at issue in this case: "Third, the defendant used a [weapon]." *Id.* We found that the district court's instruction, "the defendant used a prison-made knife," deprived the government of its burden to prove the defendant used a dangerous weapon.[2] Nonetheless, we held the error harmless. *Id.* at 939.

---

[2]The third elements of both model jury instructions have since been amended to resolve the ambiguity. *See* 9th Cir. Crim. Jury Instr. 8.5 (2008). The third element of that instruction now reads, "[t]hird, the defendant used a *dangerous weapon*." *Smith*, 561 F.3d at 937 n.2 (quoting 9th Cir. Model Crim. Jury Instr. 8.5 (2008)) (alteration and emphasis in original).

A jury instruction error is harmless if it is " 'clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error.' " *United States v. Gracidas-Ulibarry*, 231 F.3d 1188, 1197 (9th Cir. 2001) (quoting *Neder v. United States*, 527 U.S. 1, 18 (1999)).

**[3]** The model jury instruction at issue in this case provides that an object is "a dangerous or deadly weapon" under 18 U.S.C. § 111(b) "if it is used in a way that is capable of causing death or serious bodily injury." 9th Cir. Crim. Jury Instr. 8.2. "Courts interpreting § 111 have adopted the commonly accepted definition of a deadly or dangerous weapon . . . : any object which, as used or attempted to be used, may endanger the life of or inflict great bodily harm on a person." *United States v. Sanchez*, 914 F.2d 1355, 1358 (9th Cir. 1990) (internal quotation marks omitted).

**[4]** That a car, truck, automobile, or vehicle can constitute a dangerous or deadly weapon under 18 U.S.C. § 111(b) is not a new holding. While here we review for the first time an erroneous jury instruction omitting that element, we have previously upheld convictions for sufficient evidence where the dangerous or deadly weapons used were vehicles.

In *United States v. Aceves-Rosales*, 832 F.2d 1155, 1156 (9th Cir. 1987), we held that sufficient evidence supported a defendant's conviction for assault on a federal officer with a deadly or dangerous weapon under § 111(b) where an officer reached into the defendant's car to remove the keys from the ignition, the defendant stepped on the accelerator, the officer ran alongside the automobile for "about seventy-five yards," and eventually "let go and rolled away from the car, sustaining minor injuries." While we were not applying harmless error review, we did observe, "It is indisputable that an automobile can inflict deadly force on a person and that it can be used as a deadly weapon." *Id.* at 1157.

In *Galvan v. United States*, 318 F.2d 711, 712 (9th Cir. 1963), we held sufficient evidence supported a defendant's

conviction for "assaulting a narcotics officer with a deadly and dangerous weapon, to wit: a Cadillac automobile." In that case, there was "little doubt that the officer had to move very quickly and that the car would have 'run him down' if he hadn't jumped." *Id.* While we did not specifically analyze the deadly or dangerous weapon element, by upholding the conviction we accepted the finding that the automobile constituted a deadly or dangerous weapon. *Id.*

Similarly, in *United States v. Sanchez*, 914 F.2d at 1359, we upheld a conviction under § 111(b) where the deadly or dangerous weapon used was an automobile despite conflicting jury instructions as to the necessary level of intent. There, the defendant "drove straight at" the officer with his automobile. *Id.* at 1357. The officer dived under his police car then "felt an impact and felt rocks and dirt hitting him in the back." *Id.* The officer subsequently radioed for assistance and informed his fellow officers that he had been "rammed." *Id.* Again, while we did not expressly hold that an automobile may constitute a deadly or dangerous weapon, that finding was necessary to sustain the conviction. *See id.*

Our en banc panel in *Smith* recently explained that under 18 U.S.C. § 113, "dangerous weapons" constitute both inherently dangerous weapons—or dangerous weapons *per se*—such as "guns, knives, and the like," 561 F.3d at 939 (internal quotation marks and citation omitted), as well as other seemingly innocuous objects that may become dangerous or deadly given "the manner in which the[y] . . . [are] used," *id.* (quoting *United States v. Guilbert*, 692 F.2d 1340, 1343 (11th Cir. 1982) (per curiam) (holding a "belt" and a "shoe" to be dangerous weapons)).

We find this distinction equally applicable to the definition of a "deadly or dangerous weapon" under 18 U.S.C. § 111(b). We have noted that under § 111(b), a deadly or dangerous weapon is "any object which, as used or attempted to be used, may endanger the life of or inflict great bodily harm on a per-

son." *Sanchez*, 914 F.2d at 1358. This definition implicitly encompasses both inherently dangerous weapons—such as guns or knives—and seemingly innocuous objects—such as belts and shoes used in a dangerous manner.

**[5]** As stated in the applicable model jury instruction, for objects that fall within the latter category to be considered deadly or dangerous weapons under § 111(b), they must be "used in a way that is capable of causing death or serious bodily injury." 9th Cir. Crim. Jury Instr. 8.2. This definition is consistent with our caselaw upholding convictions premising liability on the assumption that an automobile may constitute a deadly or dangerous weapon under § 111(b).

A jury instruction error is harmless where there is "overwhelming and uncontradicted evidence at trial" establishing the omitted element beyond a reasonable doubt. *United States v. Hollis*, 490 F.3d 1149, 1157 (9th Cir. 2007). Here, Anchrum twice tried to run down officers with his car. First, Anchrum aimed his vehicle at Agent Solek and came to a stop. Agent Solek exited his vehicle wearing a black raid vest with large yellow letters reading "Police," drew his sidearm, began walking toward Anchrum's vehicle, and yelled at Anchrum to "get his hands up." Then, Anchrum gripped his steering wheel and slammed on the gas pedal, heading straight for Agent Solek and causing him to "fear that [he] was about to get run over." Despite Agent Solek's attempt to dive out of the way, Anchrum nonetheless hit him on the knee as the car passed by. Second, after Officer Gamache trapped Anchrum by stopping his police car with red and blue lights flashing on a side street, Anchrum attempted to escape by aiming his vehicle at Officer Gamache's police car, accelerating, and hitting the police car—causing Anchrum's car to go into a "spin-out."

**[6]** There is no question that Anchrum used his vehicle in a way that "may endanger the life of or inflict great bodily harm on a person." *Sanchez*, 914 F.2d at 1358. We have noted

that it "is indisputable that an automobile can inflict deadly force on a person and that it can be used as a deadly weapon." *Aceves-Rosales*, 832 F.2d at 1157. There is no doubt that when Anchrum intentionally attempted to run down Agent Solek and actually impacted Officer Gamache's car he was endangering their lives as well as using his vehicle in a way that could inflict great bodily harm.

**[7]** As a result, the evidence here supports the finding that it is "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." *Gracidas-Ulibarry*, 231 F.3d at 1197 (citation omitted). Accordingly, we hold the district court's erroneous jury instruction omitting the dangerous or deadly weapon element was harmless error that did not affect Anchrum's substantial rights. *See* 28 U.S.C. § 2111.

## III

Anchrum argues the district court abused its discretion in allowing Agent Solek to testify as both a percipient and expert witness contrary to our opinion in *Freeman*, 498 F.3d at 904, and that Agent Solek violated Rule 704(b) by opining as to Anchrum's requisite mental state during the expert phase of his testimony. Both arguments are without merit.

## A

In *Freeman* we warned of the dangers inherent in permitting investigating police officers—in that case a "case agent" —to testify as both percipient and expert witnesses and we highlighted four "concerns" with the practice. 498 F.3d at 904. First, we expressed concern "that a case agent who testifies as an expert receives 'unmerited credibility' for lay testimony." *Id.* (quoting *United States v. Dukagjini*, 326 F.3d 45, 53 (2d Cir. 2003). Second, we noted that "expert testimony by a fact witness or case agent can inhibit cross-examination" because a "failed effort to impeach the witness as expert may

effectively enhance his credibility as a fact witness." *Id.* (internal quotation marks omitted). Third, "there is an increased danger that the expert testimony will stray from applying reliable methodology and convey to the jury the witness's sweeping conclusions about appellants' activities." *Id.* (internal quotation marks omitted). Fourth, there is a danger that some "jurors will find it difficult to discern whether the witness is relying properly on his general experience and reliable methodology, or improperly on what he has learned of the case." *Id.*

**[8]** Despite these concerns, however, we reasoned that "the use of case agents as both expert and lay witnesses is not so inherently suspect that it should be categorically prohibited." *Id.* at 904. As a result, we advised district courts that "[i]f jurors are aware of the witness's dual roles, the risk of error in these types of trials is reduced." *Id.* Finally, we concluded that the district court in that case had not sufficiently separated the witness's dual roles and that there was a "blurred distinction" between the detective's expert and lay testimony. *Id.*

Here, in careful consideration of our decision in *Freeman*, 498 F.3d at 904, the district court clearly separated Agent Solek's testimony into a first "phase" consisting of his percipient observations, and a second "phase" consisting of his credentials in the field of drug trafficking and expert testimony regarding the modus operandi of drug traffickers.

Defense counsel raised the *Freeman* issue with the court before Agent Solek testified. As a result, the district court agreed to—and actually did—separate the testimony into two distinct phases and gave the jury an instruction that they were the ultimate finders of fact. Defense counsel even conceded, "Judge, if, as my colleague had indicated earlier, she was going to do . . . the fact section, then say, now I'm going to ask you expert questions, then I think that would protect

everything . . . ." The prosecutor then developed lay testimony before proceeding to Agent Solek's expert testimony.

[9] When the district court divided Agent Solek's testimony into two separate phases it avoided blurring the distinction between Agent Solek's distinct role as a lay witness and his role as an expert witness. Not only were these two phases separated temporally by a sidebar, but when the prosecutor began the expert phase, she stated, "Agent Solek, I'd like to shift gears here a little bit and talk about some of your education, professional training, and law enforcement experience."

[10] Accordingly, we find that the concerns we expressed in *Freeman* were avoided here and the district court did not exceed the permissible bounds of its discretion in admitting Agent Solek's testimony.

**B**

[11] Nor did Agent Solek opine as to Anchrum's requisite mental state in the expert portion of his testimony in violation of Rule 704(b). Under Rule 704(b), an "expert witness may not state an opinion as to whether the defendant did or did not have the mental state or condition constituting an element of the crime or a defense thereto. An expert witness is not permitted to offer a direct opinion on the defendant's guilt or innocence." *Freeman*, 498 F.3d at 906 (citing *United States v. Fleishman*, 684 F.2d 1329, 1335 -36 (9th Cir. 1982).

18 U.S.C. § 924(c)(1)(A) provides, "any person who, during and in relation to any . . . drug trafficking crime . . . uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm," shall be subject to an additional sentence. Anchrum maintains that Agent Solek's expert testimony opined as to Anchrum's intent to possess the firearms "during and in relation to" or "in furtherance of" his drug trafficking crime. *Id.*

**[12]** Law enforcement experts may " 'testify as to the general practices of criminals to establish the defendants' modus operandi' which 'helps the jury to understand complex criminal activities, and alerts it to the possibility that combinations of seemingly innocuous events may indicate criminal behavior.' " *Freeman*, 498 F.3d at 906 (quoting *United States v. Valencia-Amezcua*, 278 F.3d 901, 908 -09 (9th Cir. 2002)).

Here, Agent Solek described the various reasons a hypothetical drug dealer would posses a firearm. He gave the description in the second person point of view—so that it was told through the addressee's point of view—using words such as "you," "you're," and "your" instead of "he," "he's," and "his." Specifically, he stated,

> Well—if you're driving around with a loaded weapon and you have narcotics in your car, then again, we're going back to what are you using the weapon for, why is it there. It's got to be there for a purpose. You're either going to use it, number 1, if—if you get stopped, to try to get away, which would be bad for us, for law enforcement. Number two, you're going to do a drug deal and you're worried that the person that you're giving your drugs to is going to—rip you off, to try to steal your drugs instead of paying you money. Or, number 3, you do a successful drug deal and you're worried that somebody else that knows that you went over there and you just made $5,000 is going to come up and try to take your $5,000. So you have it for your protection, or you have it to—to get away with again. You know, the number 1—the bad reason.

This testimony does not reference Anchrum. Nevertheless, Anchrum argues that the form of the question, which referenced "this car," called for an opinion as to his particular mental state. The question, however, ended with the call "What's the significance of that to you in your experience?"

This question does not call for any discussion of Anchrum's mental state, but rather a discussion of the modus operandi of the drug dealers that Agent Solek had encountered "in [his] experience." As in *Freeman*, Agent Solek "offered no opinion as to whether [Anchrum] possessed the requisite criminal intent" to possess firearms, "but instead described a common practice of those who do have such intent." 498 F.3d at 906 -07.

**[13]** As a result, we find that his testimony easily fits within the permissible kind of expert testimony discussed in *Freeman*, and that Agent Solek did not state an opinion "as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged." Fed. R. Evid. 704(b).

## IV

Finally, the district court did not abuse its discretion in applying a six-level official victim sentencing enhancement under U.S.S.G. § 3A1.2 or fail to make the necessary findings of fact when Anchrum objected to the enhancement in the Presentence Report ("PSR"). U.S.S.G. § 3A1.2(c)(1) provides, "If, in a manner creating a substantial risk of serious bodily injury, the defendant . . . knowing or having reasonable cause to believe that a person was a law enforcement officer, assaulted such officer during the course of the offense or immediate flight therefrom . . . increase by 6 levels."

**[14]** "The 'Official Victim' enhancement does not require that a defendant harbor any particular ill-will towards federal agents. It is enough that a defendant knows that the victim is a federal officer and then assaults the officer in an attempt to get away or evade capture." *United States v. Rivera-Alonzo*, 584 F.3d 829, 836 (9th Cir. 2009) (holding defendant's sentence properly enhanced under U.S.S.G. § 3A1.2 where the defendant saw a Border Patrol agent in uniform, attempted to run away, eventually dove at the agent's feet, tackled him,

and took the agent's gun before being subdued by another agent). "The key factors are knowledge of the victim's official status and assaultive conduct motivated by that knowledge." *Id.*

As required by Federal Rule of Criminal Procedure 32, the district court expressly addressed—and overruled—Anchrum's objection at sentencing. The district court took account of Anchrum's objection, then stated, "I have reviewed the arguments and I agree that that six-level enhancement is appropriate in regard to the count of conviction as it relates to Agent Solek. So I will apply that six-level enhancement." Immediately thereafter, the court asked, "Now, I think I have covered the outstanding objections as I understood them to determinations in the PSR. Are—is there anything else that I've missed? Does anybody else have anything they want to raise at this point before we move on to 3553 factors?" The prosecutor responded, "Not on behalf of the government, Your Honor." Defense counsel then stated, "I think you've responded to them as well, Judge."

**[15]** Furthermore, throughout sentencing the district court recited the testimony at trial and referenced Anchrum's act of intentionally driving his vehicle at—and striking—Agent Solek after he exited his police car in a vest clearly marked "Police." These facts easily support the official victim enhancement under U.S.S.G. § 3A1.2(c)(1). *See Rivera-Alonzo*, 584 F.3d at 836.

**V**

Accordingly, Anchrum's conviction and sentence are **AFFIRMED**.