**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellant,*

v.

BRUCE WEYHRAUCH,
            *Defendant-Appellee.*

No. 07-30339

D.C. No.
CR-07-00056-JWS

OPINION

Appeal from the United States District Court
for the District of Alaska
John W. Sedwick, District Judge, Presiding

Argued and Submitted
August 4, 2008—Anchorage, Alaska

Filed November 26, 2008

Before: Dorothy W. Nelson, A. Wallace Tashima and
Raymond C. Fisher, Circuit Judges.

Opinion by Judge Fisher

**COUNSEL**

Nicholas A. Marsh, Trial Attorney, United States Department of Justice, Criminal Division, Public Integrity Section, Washington, D.C., for the plaintiff-appellant.

Douglas Pope, Pope & Katcher, Anchorage, Alaska, for the defendant-appellee.

**OPINION**

FISHER, Circuit Judge:

This is an interlocutory appeal by the government of the district court's pretrial order excluding evidence from a mail fraud prosecution. It presents a matter of first impression in this circuit — whether a federal honest services mail fraud prosecution under 18 U.S.C. §§ 1341 and 1346 requires proof that the conduct at issue also violated an applicable state law. Preliminarily, we must also address the government's repeated failures to certify this appeal properly according to the jurisdictional requirements of 18 U.S.C. § 3731. We accept the government's fourth attempt to certify, and thus have jurisdiction under § 3731. On the merits, we disagree with district court that a state law violation is required, and thus reverse the court's order excluding certain evidence from trial.

## I.  BACKGROUND

Defendant Bruce Weyhrauch, a lawyer, was a member of the Alaska House of Representatives in 2006 while Alaska's legislature was considering legislation that would alter how the state taxed oil production. According to the criminal indictment against him, VECO Corp., an oil field services company, took an active interest in the legislature's reconsideration of the oil tax, and two of its executives had a series of contacts with Weyhrauch regarding the pending legislation.[1] The indictment alleges that Weyhrauch solicited, by mail, telephone and personal contact, future legal work from VECO in exchange for voting on the oil tax legislation as VECO instructed and taking other actions favorable to VECO in Weyhrauch's capacity as state legislator, such as maneuvering the legislation and reporting information about proposed changes to the legislation to the VECO executives. The indictment does not allege that Weyhrauch received any compensation or benefits from VECO or its executives during this period, but alleges facts suggesting that Weyhrauch took the actions favorable to VECO on the understanding that VECO would hire him in the future to provide legal services to the company.

Count VII of the indictment charges Weyhrauch with devising "a scheme and artifice to defraud and deprive the State of Alaska of its intangible right to [his] honest services . . . performed free from deceit, self-dealing, bias, and concealment" and attempting to execute the scheme by mailing his resume to VECO ("the honest services charge"). Before

---

[1]The government prosecuted Weyhrauch and Peter Kott, another state legislator, together. On September 5, 2007, after the government informed the parties and district court that it intended to appeal the district court's decision excluding evidence as to Weyhrauch only, the district court granted Weyhrauch's severance motion. Kott was then tried on four of the counts in the indictment and convicted of three. Kott has appealed his conviction and sentence. *See United States v. Kott*, No. 07-30496. This appeal does not concern Kott's conviction.

trial, the parties filed cross-motions regarding the admission or exclusion of evidence related to the honest services charge. Specifically, the government proposed to introduce: (1) legislative ethics publications containing excerpts of various Alaska state statutes addressing conflicts of interest and disclosure requirements; (2) evidence that members of the Alaska State Legislature customarily acknowledge the existence of conflicts of interests on the floor of the Legislature, and that Weyhrauch never disclosed he was negotiating for employment with VECO; (3) a description of the ethics training Weyhrauch had received; and (4) evidence that Weyhrauch served on the Legislature's Select Committee on Ethics.

The district court found that the proffered evidence related only to duties to disclose a conflict of interest that might be imposed by *state* law, and that state law did not require Weyhrauch to disclose the conflict of interest he faced in discharging his duties while negotiating for future employment with a company affected by pending legislation.[2] The government argued that the evidence should nonetheless be admitted because proof that a legislator knowingly concealed a conflict of interest may be used to support an honest services fraud conviction even if state law does not require disclosure of the conflict of interest. Recognizing an absence of Ninth Circuit precedent and a split among the other circuits on this issue, the district court adopted the approach outlined by the Fifth Circuit in *United States v. Brumley*, 116 F.3d 728 (5th Cir. 1997) (en banc), and concluded that "any duty to disclose sufficient to support the mail and wire fraud charges here must be a duty imposed by state law." Accordingly, on September 4, 2007, the district court granted Weyhrauch's motion, denied the government's motion and excluded the proffered evidence. The next day, September 5, the government initiated this interlocutory appeal of the district court's ruling.

---

[2]The government has not appealed these aspects of the district court's ruling.

## II.  STANDARD OF REVIEW

We review a district court's ruling excluding evidence for abuse of discretion. *See United States v. Alvarez*, 358 F.3d 1194, 1205 (9th Cir. 2004). "The district court abuses its discretion when its evidentiary rulings are based on an erroneous view of the law or a clearly erroneous assessment of the facts." *United States v. Nguyen*, 465 F.3d 1128, 1130 (9th Cir. 2006) (internal quotation marks omitted).

## III.  CERTIFICATION OF THIS APPEAL UNDER § 3731

**[1]** Under 18 U.S.C. § 3731, the government may bring an interlocutory appeal "if the United States attorney certifies to the district court that the appeal is not taken for purpose of delay and that the evidence is a substantial proof of a fact material in the proceeding." *See United States v. W.R. Grace*, 526 F.3d 499, 504-05 (9th Cir. 2008) (en banc). We recently recounted in detail the procedural history of this interlocutory appeal in a published order, *see United States v. Weyhrauch*, ___ F.3d ___, 2008 WL 4277587 (9th Cir. Sept. 8, 2008) (order to show cause), so we summarize only the pertinent details here.

Nicholas Marsh, lead trial counsel from the Department of Justice, Criminal Division, Public Integrity Section (PIS), orally advised the district court at a September 5 pre-trial conference that the government intended immediately to appeal the ruling, that the excluded evidence was substantial proof of a material fact and that the appeal was not being taken for the purpose of delay. Based on this oral certification, the district court stayed the trial pending the interlocutory appeal. However, because the purported certification to the district court was not made by the United States Attorney as required by § 3731, before oral argument we issued an order to show cause (OSC) why the appeal should not be dismissed as improperly certified.

In its response, the government argued that Marsh's certification was sufficient under § 3731 because it was made in consultation with and at the direction of William M. Welch II, Chief of PIS, who was overseeing the prosecution, and submitted a document signed by Chief Welch, dated July 25, 2008, certifying the appeal pursuant to § 3731. The government failed to explain how Chief Welch, who is not a United States Attorney, could properly certify an appeal under § 3731, so after oral argument we issued a second OSC to address this issue.

In response, the government submitted a formal recusal notice, dated November 7, 2005, from the Executive Office for United States Attorneys stating that the United States Attorney's Office for the District of Alaska was recused from the investigation that led to the prosecution of Weyhrauch and that PIS had agreed to handle the matter in its entirety. The government also continued to argue that trial attorney Marsh's September 5, 2007 certification was sufficient, but on a new theory that he was himself authorized to certify the appeal because he had been specially appointed under 28 C.F.R. § 0.13(a) by the Deputy Assistant Attorney General and therefore was authorized to conduct "any legal proceeding, civil or criminal, including grand jury proceedings and proceedings before committing magistrates, which United States attorneys are authorized by law to conduct." 28 C.F.R. § 0.13(a). In a published OSC, we held that the recusal notice failed to explain Chief Welch's authority to certify the appeal and rejected the government's argument that any attorney specially appointed under § 0.13(a) can certify an interlocutory appeal under 18 U.S.C. § 3731. *Weyhrauch*, 2008 WL 4277587 at *3, *6. We gave the government a final opportunity to demonstrate that this appeal was properly certified.

**[2]** On September 22, 2008, the government submitted two documents signed by Attorney General Michael Mukasey.[3] In

---

[3]Remarkably, the government also continued to argue that the recusal notice was sufficient to demonstrate that Chief Welch possessed authority

the first, the Attorney General averred that the appeal was not taken for the purposes of delay and that the evidence at issue is substantial proof of facts material to the proceeding; in the second, he ratified Chief Welch's written certification of July 25, 2008 and confirmed that Chief Welch had been delegated authority to make that certification. We accept that the Attorney General can himself certify an appeal. Plainly, Congress' designation of the United States Attorney as the one authorized to make the requisite § 3731 certification was not intended to preclude certification by an equivalent or higher authority should there be no United States Attorney or acting United States Attorney overseeing a prosecution.[4] Because the ultimate authority to appoint an acting United States Attorney rests with the Attorney General under 28 U.S.C. § 515(a), *see Weyhrauch*, 2008 WL 4277587, at *4, the Attorney General can certify an appeal under § 3731 if no one else has been properly designated to do so. Because we conclude that the

_____

to certify the appeal. Setting aside for the moment that the government's filing was made in response to an order in which we squarely held that the recusal notice was insufficient, the government's continued insistence that the recusal notice is sufficient ignores the rationale for our holding: when an investigation or prosecution is being overseen by someone outside of a United States Attorney's office, that person can certify an appeal only if properly appointed pursuant to 28 U.S.C. § 515(a) as the acting United States Attorney for the purposes of that investigation or prosecution. Although a document demonstrating that an entire United States Attorney's office was recused from a case does suggest that someone else is running that case, it does not demonstrate that the Attorney General appropriately appointed that person as acting United States Attorney or to certify an appeal under 18 U.S.C. § 3731.

[4]As the government noted in its most recent filing, some investigations originate and are conducted within the Department of Justice, without any involvement of the local United States Attorney's office. The Department would do well to adopt procedures to ensure that someone has been expressly delegated authority to certify interlocutory appeals under § 3731 in such cases. *See Weyhrauch*, 2008 WL 4277587, at *4-5 (holding that someone outside of a United States Attorney's office can certify an appeal under § 3731 only if specifically appointed to do so under 28 U.S.C. § 515(a)).

Attorney General's own certification is sufficient, we do not decide whether ratification alone would suffice. See *Weyhrauch*, 2008 WL 4277587, at *4 (noting that the government "has not submitted any *documentation* that the Attorney General or his delegee in the EOUSA explicitly appointed Chief Welch as a special attorney or special assistant under 28 U.S.C. § 515(a) to be the acting United States Attorney for the Weyhrauch investigation and prosecution" (emphasis added)).

Although the Attorney General's certification is a proper substitute for that of the United States Attorney for Alaska, we must still decide whether to exercise our discretion to accept the certification at this late date. *See W.R. Grace*, 526 F.3d at 507 n.4. Weyhrauch offers two reasons why we should decline to do so. First, he contends that he has been prejudiced by the government's failure to certify this appeal properly at the outset, thereby delaying the appeal and his opportunity to address the charges against him and causing him to incur additional legal expenses defending against it. Any criminal defendant would suffer those consequences under § 3731, however, yet Congress nonetheless has authorized the government to pursue interlocutory appeals despite such hardships. Thus, Weyhrauch has been prejudiced largely by the interlocutory appeal itself, not by the government's deficient certification. Although we are sympathetic to Weyhrauch because the certification dispute, which arose only because the government failed to comply with § 3731, may have aggravated his cost of defending against the appeal, we decline to dismiss the appeal on that basis alone.

Second, Weyhrauch suggests that the government's conduct demonstrates that it did not take the § 3731 certification requirement seriously. *See W.R. Grace*, 526 F.3d at 507 ("Congress plainly intended that the decision to take an interlocutory appeal be a serious, considered judgment . . . ."). The government's belief that the oral certification by the line prosecutor and the subsequent written certification by Chief Welch without accompanying documentation of his delegated

authority were sufficient is certainly difficult to fathom in light of our previous holdings. *See Weyhrauch*, 2008 WL 4277587, at *3 ("[O]ur prior decisions make clear that a § 3731 certification must be made personally by the United States Attorney or by someone acting with legitimate, delegated authority that is sufficiently documented." (internal citations omitted)). Nonetheless, we are satisfied that the government did not take the decision to appeal lightly. The government has represented that the trial attorney consulted with the attorney supervising the prosecution and the Solicitor General before initiating the appeal. The legal issue on the merits presents a question of first impression in this circuit and therefore is not frivolous. Even though the government was careless about the certification process, we conclude that the government did not willfully disregard the certification requirement itself.

Moreover, because this case presents a factual scenario (recusal of the entire United States Attorney's office) not addressed in any of our prior opinions (or by any other circuit) and the Attorney General has now given this issue his personal attention, we will excuse the government's confusion and allow it to supplement the record with the Attorney General's certification. In doing so, however, we point out that we have previously invited the government to submit documentation of properly delegated authority when the certification is made by someone other than the United States Attorney, *see United States v. Wallace*, 213 F.3d 1216, 1219 (9th Cir. 2000), and more recently held that a trial attorney lacks authority to certify an appeal, *see W.R. Grace*, 526 F.3d at 506. Apparently, our hortatory language and square holdings have not convinced the government that the statutory requirements for § 3731 certification are *requirements* rather than suggestions. We shall not be so forgiving in the future. *See United States v. Eccles*, 850 F.2d 1357, 1359 (9th Cir. 1988) ("We recognize . . . that a general rule excusing the government from filing a certificate until after oral argument would eviscerate the statutory requirement that the United States

attorney certify that the appeal has not been taken to delay trial.").

## IV.   HONEST SERVICES MAIL FRAUD

Accepting our jurisdiction under 18 U.S.C. § 3731, we address whether the district court properly excluded the government's proffered evidence. Weyhrauch was indicted under 18 U.S.C. § 1341, which criminalizes the use of the postal services in carrying out a "scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." Before 1987, we and other courts interpreted § 1341 as covering schemes to defraud another not just of money and property, but also of "intangible rights," including the right of citizens to have public officials perform their duties honestly. *See United States v. Williams*, 441 F.3d 716, 721-22 (9th Cir. 2006); *see also United States v. Sorich*, 523 F.3d 702, 707 (7th Cir. 2008). In 1987, the Supreme Court rejected the intangible rights theory of mail fraud, holding:

> Rather than construe [§ 1341] in a manner that leaves its outer boundaries ambiguous and involves the Federal Government in setting standards of disclosure and good government for local and state officials, we read § 1341 as limited in scope to the protection of property rights. If Congress desires to go further it must speak more clearly than it has.

*McNally v. United States*, 483 U.S. 350, 360 (1987).

**[3]** Shortly thereafter, Congress in 1988 chose to "speak more clearly" by enacting 18 U.S.C. § 1346, specifying that for the purposes of the mail, wire and bank fraud statutes, "the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services." *See Williams*, 441 F.3d at 721-22 (holding that Congress restored the pre-*McNally* landscape by passing

§ 1346). Unfortunately, Congress did not define the concept of "honest services" in § 1346, thereby creating some confusion over the reach of the mail fraud statute. *See United States v. Urciuoli*, 513 F.3d 290, 294 (1st Cir. 2008) ("The central problem is that the concept of 'honest services' is vague and undefined by the statute. So, as one moves beyond core misconduct covered by the statute (*e.g.*, taking a bribe for a legislative vote), difficult questions arise giving coherent content to the phrase through judicial glosses."). Because the statute's plain language is inconclusive, we turn for guidance in construing the statute to our pre-*McNally* case law and any relevant post-*McNally* decisions, and then consider pre- and post-*McNally* decisions from our sister circuits. *See Williams*, 441 F.3d at 722.

**[4]** The district court accurately observed that we have not considered what § 1346 requires of public officials and that our sister circuits have expressed divergent views on the proper meaning of "honest services" for public officials. The Fifth Circuit has adopted the so-called "state law limiting principle," which requires the government to prove that a public official violated an independent state law to support an honest services mail fraud conviction. *See Brumley*, 116 F.3d at 734-35. The Third Circuit has adopted a similar rule requiring the government to prove the public official violated a fiduciary duty specifically established by state *or* federal law. *See United States v. Murphy*, 323 F.3d 102, 116-17 (3d Cir. 2003).

The majority of circuits, however, have held that the meaning of "honest services" is governed by a uniform federal standard inherent in § 1346, although they have not uniformly defined the contours of that standard. *See Sorich*, 523 F.3d at 712 (holding that sources other than state law can establish a duty to provide honest services); *Urciuoli*, 513 F.3d at 298-99 (declining to read honest services fraud statute to require violation of state law); *United States v. Walker*, 490 F.3d 1282, 1299 (11th Cir. 2007) (holding that an honest services fraud

conviction "does not require proof of a state law violation"); *United States v. Bryan*, 58 F.3d 933, 942 (4th Cir. 1994) (holding that the duty of honesty is defined irrespective of the existence of state law). The Seventh Circuit has read § 1346 to require public officials to breach a fiduciary duty with an intent to reap private gain to support an honest services mail fraud conviction, *see Sorich*, 523 F.3d at 708, and the First Circuit has suggested that the official's misconduct must involve more than a mere conflict of interest to support a conviction, *see Urciuoli*, 513 F.3d at 298-99. Finally, several circuits have read into § 1346 the requirement that a public official's breach of duty must be material and accompanied by fraudulent intent. *See United States v. Cochran*, 109 F.3d 660, 667 (10th Cir. 1997); *United States v. Jain*, 93 F.3d 436, 442 (8th Cir. 1996). In essence, our sister circuits have construed the meaning of "honest services" in ways that limit, to differing degrees, the reach of § 1346 into state and local public affairs.

One concern is that a literal reading of § 1346 might give federal prosecutors *unwarranted influence* over state and local public ethics standards. *See Brumley*, 116 F.3d at 734 (expressing concern that reading § 1346 to create a uniform standard of conduct would erode federalist structure). This is particularly relevant in light of the Supreme Court's admonition that "unless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance in the prosecution of crimes," *Cleveland v. United States*, 531 U.S. 12, 25 (2000) (internal quotation marks omitted). Other valid considerations are (1) the need to give public officials *fair notice* of the conduct that would subject them to the federal fraud statutes' serious criminal penalties, *see Urciuoli*, 513 F.3d at 294 (noting the need to assure "fair notice to those governed by the statute"); *see also Williams*, 441 F.3d at 724 ("In examining a statute for vagueness, we must determine whether a person of average intelligence would reasonably understand that the charged conduct is proscribed."); (2) a desire to establish *firm boundaries* lest every dishonest

act by public officials lead to federal criminal liability, *see Sorich*, 523 F.3d at 707-08 (noting the need for a limiting principle that "cabins zealous prosecutors by insuring that not every violation of a fiduciary duty becomes a federal crime"); *Urciuoli*, 513 F.3d at 294 (expressing concern that the statute might "embrace every kind of legal or ethical abuse remotely connected to the holding of a governmental position"); and (3) the potential for *selective enforcement* against public officials, many of whom engage in partisan political activity.

The Fifth Circuit's state law limiting principle, which the district court adopted, addresses all of these concerns. It limits how much control federal prosecutors have over state public affairs by restricting federal criminal liability to conduct prohibited by the states themselves and sets a clear outer limit to the reach of the federal statute by tying liability to violations of specific state statutes, thereby allaying concerns over fair notice. Moreover, to the extent the honest services doctrine is intended to ensure public officials act ethically, elected state officials are accountable to their constituencies, who can punish dishonest or unethical conduct directly at the ballot box, and nonelected state officials may be subject to state ethics laws, which can be strengthened through the democratic process. Thus, because the federal criminal statutes are not the only remedy for dishonest conduct not proscribed by state law, there is some degree of logic in reserving to the states exclusive control over the ethical standards for their own public officials.

**[5]** Nonetheless, we decline to adopt the state law limiting principle.[5] As an initial matter, our pre-*McNally* decisions do

---

[5]Although we reject the state law limiting principle in the context of honest services prosecutions of public officials, we express no opinion on the role of state law in honest services fraud prosecutions in the *private* context. *See Sorich*, 523 F.3d at 708 (noting that courts have "crafted special requirements in the limited context of honest services fraud in the private sector"). Similarly, we express no opinion on what effect, if any, state law that expressly condones or excuses certain conduct would have because Alaska law did not excuse Weyhrauch's conduct here. *See Urciuoli*, 513 F.3d at 298 (observing that state law might be relevant if it "immunize[s]" certain conduct).

not support the conclusion that the federal fraud statutes derive their content solely from state law. In *United States v. Bohonus*, 628 F.2d 1167, 1171 (9th Cir. 1980), we explained that the basis for prosecuting public officials for honest services fraud rests on "the deprivation of the public's right to honest and faithful government." This broad characterization of the duty, without reference to any underlying state law duty, suggests that public officials' duty of honesty is uniform rather than variable by state. We were less equivocal in *United States v. Louderman*, 576 F.2d 1383, 1387 (9th Cir. 1978), holding that "state law is irrelevant in determining whether a certain course of conduct is violative of the wire fraud statute." Although *Louderman* is not directly on point because it involved a traditional wire fraud prosecution rather than an honest services mail fraud prosecution, our refusal to define the federal fraud statutes based on the contours of state law informs our decision here. In short, we have never limited the reach of the federal fraud statutes only to conduct that violates state law.[6]

[6] We also cannot find any basis in the text or legislative history of § 1346 revealing that Congress intended to condi-

---

[6] We recently affirmed the conviction of a private individual for honest services fraud because he breached his fiduciary duty of loyalty. *See Williams*, 441 F.3d at 722-24. We explained that the defendant stood in a fiduciary relationship to his victim, citing an Oregon statute about powers of attorney, *id*. at 723, but later observed that the defendant "undertook the high duties of honesty and loyalty" without reference to the state statute, *id*. at 724. Arguably, our citation to the state law suggests we relied on state law as the source of the fiduciary relationship. On the other hand, we affirmed the conviction because the defendant violated duties of honesty and loyalty, which are mentioned nowhere in the text of the state statute, so our decision may have turned on uniform duties of honesty and loyalty that exist in all relationships of trust. *See Sorich*, 523 F.3d at 712 (citing *Williams* for the proposition that a source other than state law can create a fiduciary obligation). In any event, we were not required in *Williams* to decide if § 1346 requires a violation of state law, so we do not find our passing reference to a state statute conclusive on how we might have ruled had that issue been squarely presented.

tion the meaning of "honest services" on state law. Because laws governing official conduct differ from state to state, conditioning mail fraud convictions on state law means that conduct in one state might violate the mail fraud statute, whereas identical conduct in a neighboring state would not. Congress has given no indication it intended the criminality of official conduct under federal law to depend on geography. Moreover, although the Supreme Court has warned against interpreting the mail fraud statute to allow federal prosecutors to intrude into areas traditionally governed by state law absent a clear showing that Congress intended to do so, *see Cleveland*, 531 U.S. at 24 (expressing reluctance over subjecting "to federal mail fraud prosecution a wide range of conduct traditionally regulated by state and local authorities"); *McNally*, 483 U.S. at 360 (declining to read the mail fraud statute "in a manner that . . . involves the Federal Government in setting standards of disclosure and good government for local and state officials"), Congress demonstrated a clear intent to reinstate the line of pre-*McNally* honest services cases when it enacted § 1346, *see Williams*, 441 F.3d at 721-22. Because pre-*McNally* honest services fraud cases generally did not require state law to create the duty of honesty that public officials owe the public and the plain language of the statute does not refer to state law, we cannot infer that Congress intended to import a state law limitation into § 1346.

**[7]** Finally, federal action based on a valid constitutional grant of authority is not improper simply because it intrudes on state interests. *See* U.S. Const. art. VI, cl. 2 ("[T]he Laws of the United States . . . shall be the supreme Law of the land."). Congress has a legitimate constitutional basis for preventing public officials from using the mails to perpetrate fraud, *see Badders v. United States*, 240 U.S. 391, 393 (1916) (holding that Congress may forbid putting letters in the mail "in furtherance of a scheme it regards as contrary to public policy, whether it can forbid the scheme or not"), so the federal interest in establishing a uniform standard of conduct for public officials merits equal consideration. That interest is not

limited to preventing individuals from using the mails as a tool in a fraudulent scheme. States often regulate industries that are national and international in scope and that the federal government also regulates under concurrent constitutional authority, including the financial services, transportation, communications, oil, gas and timber industries. State regulations of these industries can have national or international implications, so the federal government may wish to prevent state action in these areas from being improperly influenced. Similarly, state laws that affect economic development within a state can influence the federal budget, reduce federal tax receipts and broadly affect the national economy. In short, Congress has a legitimate interest in ensuring that state action affecting federal priorities is not improperly influenced by personal motivations of state policymakers and regulators, and the happenstance of whether state law prohibits particular conduct should not control Congress' ability to protect federal interests through the federal fraud statutes, which are predicated on valid federal constitutional authority to regulate the mails.[7]

[8] Having rejected the state law limiting principle, we next consider the appropriate contours of honest services fraud. Our pre-*McNally* cases recognized two core categories of conduct by public officials that other courts have found sufficient to support an honest services conviction: (1) taking a bribe or otherwise being paid for a decision while purporting to be exercising independent discretion and (2) nondisclosure of material information. *See Bohonus*, 628 F.2d at 1171 (citing

---

[7]This prosecution illustrates how national policies are implicated by alleged fraud against the people of a state. Alaska's oil tax legislation could influence how companies across the nation develop and exploit petroleum resources (particularly which geographic area would be a priority for investment), with consequences for the national economy and national energy policy. Under the state law limiting principle, however, the federal government would be deprived of its ability to protect these federal interests against allegedly corrupt influences simply because a state law did not expressly forbid the conduct.

cases). Post-*McNally* public honest services fraud cases from other circuits have generally fallen into one of those two categories. *See Urciuoli*, 513 F.3d at 295 n.3 ("Typical [post *McNally*] cases involve votes paid for by bribes or based on private undisclosed financial interests of the legislator, awarding of contracts based on bribes, and the filing of false financial disclosure forms or other non-disclosures in relation to official duties." (internal citations omitted)). The post-*McNally* decisions from our sister circuits confirm our view in *Bohonus* that conduct on par with bribery and nondisclosure of material information lies at the heart of public honest services fraud. Notably, both categories of misconduct undermine transparency in the legislative process and other governmental functions. Because public officials may legitimately disagree over which of the many competing interests in society deserve support from the state, without transparency the public cannot evaluate the motivations of public officials who are purporting to act for the common good to determine whether they are in fact acting for their own benefit. Thus, the two core categories of misconduct supporting public honest services fraud ensure transparency, without which the public cannot determine whether public officials are living up to their duty of honesty. *See* John C. Coffee, Jr., *Modern Mail Fraud: The Restoration of the Public/Private Distinction*, 35 AM. CRIM. L. REV. 427, 444 (1998) (noting that courts agree that "§ 1346 may constitutionally be applied to schemes by state or local governmental officials to deprive citizens of their honest services as public fiduciaries"). We are persuaded that Congress' intent in reinstating the honest services doctrine after *McNally* was to bring at least the two core categories of official misconduct within the reach of § 1346.

**[9]** Here, Weyhrauch allegedly voted and took other official actions on legislation at the direction of VECO while engaged in undisclosed negotiations for future legal work from VECO. These allegations describe an undisclosed conflict of interest and could also support an inference of a quid pro quo arrangement to vote for the oil tax legislation in

exchange for future remuneration in the form of legal work. Because Weyhrauch's alleged conduct falls comfortably within the two categories long recognized as the core of honest services fraud, we need not define the outer limits of public honest services fraud in this case. Accordingly, the government may proceed on its theory that Weyhrauch committed honest services fraud by failing to disclose a conflict of interest or by taking official actions with the expectation that he would receive future legal work for doing so.[8]

## V.  CONCLUSION

[10] We hold that 18 U.S.C. § 1346 establishes a uniform standard for "honest services" that governs *every* public official and that the government does not need to prove an independent violation of state law to sustain an honest services fraud conviction. Because the district court excluded the evidence based, in part, on its conclusion that the government had to prove that state law imposed an affirmative duty on Weyhrauch to disclose a conflict of interest, we reverse. The government did not appeal the district court's ruling that the proffered evidence relates only to state law, and we express no opinion whether the proffered evidence is relevant to proving the government's case under the standard we have announced and leave that determination to the district court's

---

[8]The honest services doctrine exists within the broader context of the mail and wire fraud statutes, however, so the government must still prove fraudulent intent, *see Cochran*, 109 F.3d at 667 (holding that "§ 1346 must be read against a backdrop of the mail and wire fraud statutes, thereby requiring fraudulent intent"); *Bohonus*, 628 F.2d at 1172 ("Neither breach of a fiduciary duty, nor the receipt of secret profits . . . would suffice, standing alone, to show a [mail fraud] violation; there must be a recognizable scheme formed with intent to defraud."), and materiality, *see Neder v. United States*, 527 U.S. 1, 25 (1999) (holding "materiality of falsehood is an element of the federal mail fraud, wire fraud, and bank fraud statutes").

sound judgment.

**REVERSED and REMANDED.**