**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

            v.

JUDY GREEN,
            *Defendant-Appellant.*

No. 08-10149

D.C. No.
CR-05-0208-WHA

OPINION

Appeal from the United States District Court
for the Northern District of California
William H. Alsup, District Judge, Presiding

Argued and Submitted
October 5, 2009—San Francisco, California

Filed January 22, 2010

Before: Pamela Ann Rymer and A. Wallace Tashima,
Circuit Judges, and Lynn S. Adelman,* District Judge.

Opinion by Judge Tashima

---

*The Honorable Lynn S. Adelman, United States District Judge for the
Eastern District of Wisconsin, sitting by designation.

1311

## COUNSEL

Phillip H. Stillman, Cardiff, California, for the defendant-appellant.

Adam D. Hirsch, Antitrust Division, U.S. Department of Justice, Washington, DC, for the plaintiff-appellee.

## OPINION

TASHIMA, Circuit Judge:

Depending on whose version of this case you hear, defendant Judy Green is either a dedicated public schoolteacher who spent the years before her conviction working to help impoverished schools across the country, or the mastermind of a massive fraudulent scheme that bilked the federal government out of almost $60 million. The government takes the latter view, and charged Green with defrauding E-Rate, a Federal Communications Commission ("FCC") program that funds technology projects at schools and libraries. Green insists the former is true, maintaining that she is guilty of nothing more than helping schools maximize their federal funding by exploiting loopholes in the E-Rate rules and regulations. A jury eventually convicted Green of all twenty-two counts brought against her: eleven counts of wire fraud (18 U.S.C. § 1343), nine counts of bid rigging (15 U.S.C. § 1), one count of conspiracy to commit bid rigging (15 U.S.C. § 1), and one count of conspiracy to commit wire and mail fraud (18 U.S.C. § 371). Because we conclude that Green's actions amounted to fraud on the federal government, we affirm her conviction.

# BACKGROUND

## I.  The E-Rate Program

At the center of this case is a part of the FCC's Universal Service program, known as the Schools and Libraries program, or E-Rate for short. Funded by a Universal Service fee placed on telecommunications providers (and generally passed along to consumers), the Universal Service program is designed to promote telecommunications access for low-income, rural, high-cost, or otherwise underserved communities. *See* 47 U.S.C. § 254. As its official name implies, E-Rate uses its portion of Universal Service funding to finance telecommunications projects at school and libraries.

The Schools and Libraries Division ("SLD") of the Universal Service Administrative Company ("USAC")[1] is charged with distributing E-Rate's annual budget of $2.25 billion. SLD accepts applications from schools for technology projects and subsidizes those projects on a sliding scale — from 20 percent to 90 percent of a project's cost — determined by the percentage of the school's students that participate in the National School Lunch Program. 47 C.F.R. § 54.505. SLD is required to give funding priority to applications for the provision of "telecommunications services, voice mail, and Internet access." 47 C.F.R. § 54.507(g)(1). The most economically disadvantaged schools have priority for the remainder of the funds. *Id.*

As with any sizeable program, E-Rate is governed by a complicated and, at times, less than clear set of rules and regulations. Two program rules are particularly relevant to this case. First, SLD has detailed rules governing what equipment and services may be purchased with E-Rate funds. In general

---

[1]USAC is a nonprofit corporation designated by the FCC as the administrator of the Universal Service Fund, the source of funding for E-Rate and other Universal Service programs. *See* 47 C.F.R. §§ 54.5, 54.701-717.

terms, SLD will subsidize the purchase and installation of equipment needed to establish a school's connectivity. End-user devices that are needed to actually make use of that connectivity, such as computers, telephones, or fax machines, are not eligible for a subsidy by SLD. In E-Rate jargon, these categories are referred to as "eligible" and "ineligible" equipment, respectively.

Second, because E-Rate only subsidizes a portion of the cost of eligible equipment and services, a school must have the ability to cover the remaining balance of an E-Rate project's costs. Thus, the school must be able to obtain any ineligible equipment that is necessary to make use of the project. The school must also have the wherewithal to cover its co-pay, that portion of the project's cost that will not be covered by the E-Rate subsidy.

When a school wants to apply for E-Rate funds, it must first fill out an FCC form, identifying the technology project for which it seeks funding. The school provides this form to SLD, which posts it on a website to solicit bids from vendors. After the bidding is complete, the school selects the winning bid. Based upon its chosen bid, the school submits a detailed application for E-Rate funding to SLD, specifying the equipment and services to be purchased from each vendor. The application requires the school to set out the total cost of the project, the amount of eligible and ineligible equipment included in that cost, the E-Rate subsidy rate for which the school qualifies, and finally, based on the above information, the ultimate amount of funding the school seeks from SLD.

SLD reviews this detailed application to ensure that it is in compliance with E-Rate regulations. Occasionally, SLD conducts a follow-up review and asks a school to provide more information about its application. Once it has completed its review, SLD either approves or denies the school's funding request.

## II.   The Fraudulent Scheme

Green first learned of E-Rate in the 1990s, after spending more than thirty years as a public school teacher in New York City and Los Angeles. She saw an opportunity in the E-Rate program and, in 1998, left teaching to set up a consulting business to help guide schools and school districts through E-Rate's byzantine application process. Green marketed her services to the poorest of schools; almost all of her clients were eligible for the maximum 90 percent E-Rate subsidy.

According to the evidence introduced at trial, much of which was undisputed, Green obtained most of her clients by approaching school administrators at conferences held by the National Alliance of Black School Educators. At these conferences, Green, or one of her co-schemers, promised to help school districts obtain E-Rate funding for significant technology projects. Even better, they promised that the schools would be forgiven their 10 percent co-pay, and that the contractors would donate to the school districts thousands of dollars in "bonus" equipment — equipment, such as end-user equipment, that was ineligible for E-Rate funds. Needless to say, a number of school districts leapt on board.

Once hired as a consultant, Green helped her clients design their technology projects and filled out the SLD forms to solicit project bids from vendors. At the same time, Green approached potential contractors to assemble a team capable of performing the projects to her specifications. Green decided what services and equipment the contractors would supply, dictated the "bonus" items the contractors were required to provide at no charge (to the school), and informed the contractors that the schools would not be paying their share of the projects' costs. The contractors then submitted bids based upon Green's specifications.

After receiving the bids, the school districts chose Green's pre-selected contractors to implement their technology proj-

ects. Because Green had arranged the bids in advance, her chosen contractors had inflated their bids to cover the costs of the "bonus" equipment and services Green required them to provide. One witness, for example, testified that the bid Green arranged, and that his school district ultimately selected, was three to four times higher than the other bids that the school district received.

Finally, when the school districts submitted their funding requests to SLD, Green took steps to ensure that SLD would not ask questions about the projects. If SLD did ask questions, Green took steps to ensure that it would be provided with answers that minimized the chances it would follow up with further review. For example, Green wrote equipment lists to hide the fact that potentially ineligible equipment was included within the projects' scopes. She instructed the school districts to tell SLD that they planned on paying their share of the projects' costs, even though they did not. And she altered school budget information to show that the schools could afford their co-pays.

Green's conduct was eventually discovered by USAC. She was later indicted in a twenty-two count indictment. The first twenty counts charged Green with wire fraud and bid rigging in connection with completed E-Rate projects at eleven school districts across the country.[2] The final two counts were conspiracy counts based upon uncompleted technology projects at an additional fifteen school districts.

Following a nineteen-day trial, a jury convicted Green of all charges against her. The district court sentenced her to a ninety-month term of imprisonment. This appeal followed.

---

[2]Green was charged with wire fraud for all eleven of these projects. She was charged with collusion for only nine.

## DISCUSSION

Green challenges her conviction, as well as her ninety-month sentence. We affirm.

## I.  Wire Fraud Convictions

Green's overarching contention on appeal is that her actions were not fraudulent because they were not prohibited by the rules and regulations that governed the E-Rate program during the time period charged in the indictment. Specifically, Green raises three challenges to her wire fraud convictions, all of which are variations on this common theme: (1) the E-Rate rules and regulations were so poorly set out during the relevant time period that her conviction violated her due process right to fair warning that her conduct was criminal; (2) her convictions relied on regulations that took effect after the conduct charged in the indictment, violating the Ex Post Facto Clause of the Constitution; and (3) the district court's instructions erroneously gave the jury unfettered discretion to decide the legal question of which regulations were in effect during Green's purported fraud.

We review questions of law *de novo. See United States v. Kaczynski*, 551 F.3d 1120, 1123 (9th Cir. 2009) ("We review *de novo* questions of federal constitutional law . . . ."); *United States v. Romo-Romo*, 246 F.3d 1272, 1274 (9th Cir. 2001) ("Whether a jury instruction misstates elements of a statutory crime is a question of law reviewed de novo."). We conclude that the offense of wire fraud does not require that Green's conduct violated a rule or regulation of the E-Rate program; thus, her specific challenges fail.

Surprisingly, few courts have considered the precise issue Green raises: whether actions that are not otherwise expressly prohibited can nonetheless violate the federal fraud statutes. Indeed, the government, while proclaiming that Green's argu-

ments are obviously incorrect, has not cited a single case in support of its position.

**[1]** We have been unable to find a case in which a court has considered the interplay between the fraud statutes[3] and a federal rule or regulation. A number of courts, however, have considered the related issue of whether the crime of wire fraud must be predicated on a violation of state law. We have addressed this issue, albeit briefly, on at least one prior occasion. In *United States v. Louderman*, 576 F.2d 1383 (9th Cir. 1978), we disposed of the argument in a single sentence: "Furthermore, state law is irrelevant in determining whether a certain course of conduct is violative of the wire fraud statute." *Id.* at 1387; *cf. United States v. Weyhrauch*, 548 F.3d 1237, 1245 (9th Cir. 2008) (citing *Louderman* and concluding in an honest services fraud case that "we have never limited the reach of the federal fraud statutes only to conduct that violates state law"), *cert. granted in part*, 129 S. Ct. 2863 (2009).

The Eighth Circuit recently reached the same conclusion. In *United States v. Frost*, 321 F.3d 738 (8th Cir. 2003), the defendant, a certified public accountant, acted as one of two trustees for a charitable trust. *Id.* at 740. At some point the defendant began withdrawing money from the trust for his personal use without the consent of the other trustee, placing the other trustee's name or initials on invoices or checks when it was required. *Id.* He was convicted of both mail and wire fraud. *Id.* at 739.

Frost appealed his conviction, arguing in part that his conduct was not fraudulent because Arkansas law permitted him to "withdraw reasonable compensation from the Trust" without the other trustee's consent. *Id.* at 740. Because the govern-

---

[3]"It is well settled that cases construing the mail fraud and wire fraud statutes are applicable to either." *United States v. Shipsey*, 363 F.3d 962, 971 n.10 (9th Cir. 2004) (citing *Carpenter v. United States*, 484 U.S. 19, 25 n.6 (1987)).

ment could not prove that his actions were illegal, he argued, his convictions for mail and wire fraud should be overturned. *Id.* at 741. The Eighth Circuit rejected this argument, stating: "We do not agree that the government, having proved beyond a reasonable doubt each element of the offense, must also prove a violation of Arkansas law." *Id.*; *see also United States v. Williams*, 545 F.2d 47, 50 (8th Cir. 1976) (per curiam) ("A conviction for mail fraud does not depend upon a violation of state law."); *United States v. Scallion*, 533 F.2d 903, 910 (5th Cir. 1976); *United States v. Bush*, 522 F.2d 641, 646 n.6 (7th Cir. 1975).

**[2]** In a related context, the Supreme Court has also rejected the argument that the elements of wire or mail fraud include the violation of a separate law or regulation. In *Schmuck v. United States*, 489 U.S. 705 (1989), the defendant was convicted of mail fraud based upon his scheme to roll back the odometers on 150 automobiles and sell them to dealerships in Wisconsin. *Id.* at 707, 711. On appeal, the defendant argued that odometer tampering was a lesser included offense to the mail fraud charge, and that the jury should have therefore been given a lesser-included offense instruction. *Id.* at 708-10. The Court rejected this argument, concluding that the crime of mail fraud was a distinct crime that did not rely on proof of odometer tampering:

> Turning to the facts of this case, we agree with the Court of Appeals that the elements of the offense of odometer tampering are not a subset of the elements of the crime of mail fraud. There are two elements in mail fraud: (1) having devised or intending to devise a scheme to defraud (or to perform specified fraudulent acts), and (2) use of the mail for the purpose of executing, or attempting to execute, the scheme (or specified fraudulent acts). The offense of odometer tampering includes the element of knowingly and willfully causing an odometer to be altered. This element is not a subset of any element

of mail fraud. Knowingly and willfully tampering with an odometer is not identical to devising or intending to devise a fraudulent scheme.

*Id.* at 721-22.

**[3]** Based on the above, we believe it is settled that wire fraud does not require proof that the defendant's conduct violated a separate law or regulation, be it federal or state law. Rather, wire fraud has only three elements: "(1) a scheme to defraud; (2) use of the wires in furtherance of the scheme; and (3) a specific intent to deceive or defraud." *United States v. Shipsey*, 363 F.3d 962, 971 (9th Cir. 2004). The scheme to defraud must only include an "affirmative, material misrepresentation." *United States v. Benny*, 786 F.2d 1410, 1418 (9th Cir. 1986). A defendant's conduct need not otherwise be illegal in the sense that the government must also prove that the defendant's conduct violated a specific statute or regulation.

**[4]** We reject Green's contention that if we unmoor her wire fraud conviction from the E-Rate rules and regulations, her conviction will be based on nothing more than her having deprived the federal government of its right to make an "informed decision." To support this argument, Green invokes the honest services fraud cases, which simply are inapplicable to her case. Although the law of honest services fraud remains unsettled, the debate over the reach of the crime of honest services fraud need not detain us. For at the heart of that debate is the concern that honest services fraud does not require any form of tangible harm; thus, it has been argued that there is no principled limit to the reach of the statute. *See*, *e.g.*, *United States v. Sorich*, 523 F.3d 702, 707 (7th Cir. 2008) ("[G]iven the amorphous and open-ended nature of § 1346, . . . courts have felt the need to find limiting principles."), *cert. denied*, 129 S. Ct. 1308 (2009); *United States v. Urciuoli*, 513 F.3d 290, 294 (1st Cir. 2008) ("The central problem is that the concept of 'honest services' is vague and undefined by the statute."); *see also Sorich v. United States*, 129 S. Ct. 1308

(2009) (Scalia, J., dissenting from denial of *certiorari*).[4] But where, as here, financial harm to the victim is an integral part of the offense, there has never been any suggestion that a further limitation on the fraud statutes is required.

**[5]** That Green's E-Rate scheme involved millions of dollars in federal funds was sufficient to bring it squarely within the heartland of the federal fraud statutes. In such a case, the government needed only to prove a scheme to defraud; it was not required to establish that the scheme separately violated the E-Rate regulations. Accordingly, we reject Green's contention that her conduct needed to violate a rule or regulation of the E-Rate program in order to be fraudulent. Under well-established circuit precedent, as discussed in Part II, below, proof of such a violation is not an element of the fraud offense.

## II.   Sufficiency of the Evidence

Green also challenges the sufficiency of the evidence for all but one of her counts of conviction. We review *de novo* sufficiency of the evidence claims. *United States v. Overton*, 573 F.3d 679, 685 (9th Cir. 2009). "Evidence is sufficient to support a conviction unless, viewing the evidence in the light most favorable to sustaining the verdict, no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.*

### A.     Wire Fraud (Counts 1-11)

In order for the jury to convict Green of wire fraud, it had to find: "(1) a scheme to defraud; (2) use of the wires in furtherance of the scheme; and (3) a specific intent to deceive or

---

[4]The Supreme Court has granted *certiorari* in three honest services fraud cases this term to address the reach of the statute. *See Skilling v. United States*, 130 S. Ct. 393 (2009); *Weyhrauch v. United States*, 129 S. Ct. 2863 (2009); *Black v. United* States, 129 S. Ct. 2379 (2009).

defraud." *Shipsey*, 363 F.3d at 971. On appeal, Green challenges the sufficiency of the evidence as to the first and third elements.

Green, however, did not challenge the sufficiency of the evidence for her wire fraud convictions below. "[W]hen a defendant does not preserve a claim of sufficiency of the evidence by failing to make a motion for acquittal at the close of the evidence, the review is deferential, requiring reversal only upon plain error or to prevent a manifest injustice." *United States v. Delgado*, 357 F.3d 1061, 1068 (9th Cir. 2004). Thus, we review only for plain error.

We find no such manifest injustice here. The government introduced ample evidence of both a scheme to defraud and intent to defraud, much of which was undisputed. Green's co-schemers, as well as representatives from the school districts she worked with, testified that the school districts were promised that the entire project would be paid for out of E-Rate funds, and that the school districts would obtain substantial "bonus" items for free. These promises were never revealed to SLD. Further, Green testified about her own role in the scheme and admitted to much of the charged conduct. For example, Green admitted to editing equipment lists to prevent SLD from learning that the projects included potentially ineligible equipment. She also acknowledged that she took steps to conceal from SLD the fact that the schools would not be paying their co-pays.

In light of the fact that much of the evidence against her was undisputed, Green's sufficiency-of-the-evidence argument does not focus on the amount of evidence against her. Rather, she challenges the interpretation of that evidence. Green contends that there is an "innocent explanation" for her conduct — that she was helping impoverished schools by getting contractors to donate equipment and to waive the portion of the contract price that the school was required to pay. *See Delgado*, 357 F.3d at 1068-69 ("[W]hen there is an innocent

explanation for a defendant's conduct as well as one that suggests that the defendant was engaged in wrongdoing, the Government must produce evidence that would allow a rational jury to conclude beyond a reasonable doubt that the latter explanation is the correct one."). Because she was merely exploiting loopholes in the E-Rate application process, Green contends, her conduct was not criminal.

[6] We fail to see the "innocent" explanation that Green describes. Even accepting that her ultimate motives were laudable, she concealed material facts from the federal government in an attempt to induce it to fund her projects. That, standing alone, is fraud.

This case is reminiscent of *United States v. Baum*, 555 F.3d 1129 (10th Cir. 2009), in which the defendant was charged with wire fraud based upon a complicated mortgage fraud scheme:

> . . . Mr. Baum acted as the real-estate agent for the buyer, who was seeking a home loan in the subprime market because of weak credit. The buyer generally could not afford the down payment required by the lender (from 5% to 15% of the cost of the home), so the buyer borrowed that money from Mr. Baum and his associates. Mr. Baum's client agreed to buy the home at the seller's listed price, which often had been reduced over time as the home failed to sell; but Mr. Baum and his client obtained the consent of the seller and the seller's agent to list an inflated price on the purchase contract. The price inflation did not benefit the seller because Mr. Baum prepared an addendum to the purchase contract requiring the seller to pay the excess over the listed price to a named company for remodeling or repairing the home. Apparently unbeknownst to the seller, the company was merely a bank account used to funnel the money to provide cash to the purchaser and to

> pay Mr. Baum and his associates for their services and for advancing the down payment.

> The mortgage lender, of course, was not informed of the true nature of the transaction.

*Id.* at 1130.

Baum was convicted of mortgage fraud. One of his arguments for reversal on appeal was that "the failure to have remodeling or repair work done on the homes . . . amounts merely to breach of contract, not a crime." *Id.* The Tenth Circuit disagreed: "The fraud . . . was that the mortgage lender was led to believe that it was lending money to purchase a home for $X, not to purchase a home for $X-$Y and then undertake $Y worth of remodeling or repairs." *Id.* at 1132.

**[7]** As in *Baum*, Green's fraudulent scheme led SLD to believe it was funding something other than what it was actually funding. The applications Green helped prepare did not disclose the true nature of the agreements she had reached with the vendors. Instead, they distorted the full scope of the projects, concealing the added costs and the "bonus" equipment the school districts would receive. In *Baum*'s formulation, Green's actions led SLD to believe it was funding the listed equipment for $X, not $X-$Y with the school district receiving $Y worth of extra equipment and was not funding its own co-pay.

**[8]** There was ample evidence to support the wire fraud convictions. No plain error occurred.

*B.    Conspiracy to Commit Mail and Wire Fraud (Count 22)*

In order to convict Green of conspiracy to commit mail and wire fraud, the jury had to find: "(1) an agreement to engage in criminal activity, (2) one or more overt acts taken to imple-

ment the agreement, and (3) the requisite intent to commit the substantive crime." *United States v. Montgomery*, 384 F.3d 1050, 1062 (9th Cir. 2004). In a conspiracy charge, "[t]he agreement need not be explicit; it is sufficient if the conspirators knew or had reason to know of the scope of the conspiracy and that their own benefits depended on the success of the venture." *Id.* The agreement may be inferred from circumstantial evidence. *United States v. Hubbard*, 96 F.3d 1223, 1226 (9th Cir. 1996).

The conspiracy count was based upon Green's relationship with Richard Favara. Favara was the owner of Expedition Networks, a technology company that worked with Green to bid on E-Rate projects. He also was the founder of the American Education Alliance (the "Alliance"), a nonprofit started with the goal of providing computers to underprivileged schools.

Favara testified that in 2002 he worked with Green to secure fifteen E-Rate projects for Expedition Networks. As part of this process, Favara agreed to allow Green to become Director of Grants for the Alliance, despite the fact that it had no assets. Green intended to use the Alliance to award bogus grants to schools to strengthen their applications for E-Rate funding. Under this scheme, the Alliance would purport to make a grant to a poor school district so the district could claim that it had the assets to make its co-pay. Green would ensure that the school selected Expedition Networks to perform the project. Favara would then funnel a portion of the contract payments from Expedition Networks to the Alliance, which would use the money for the grant it had awarded to the school district. Those funds would eventually be returned to Expedition Networks in the form of the school's co-pay.

To help Green convince the school districts to hire her, Favara agreed to let Green post on the Alliance's website a falsified financial overview of the nonprofit. According to Favara, Green wanted to post this information "to make the

company look stronger when she was talking to schools." Favara agreed to Green's request because Expedition needed the business to "breathe financially."

**[9]** This testimony established that both Green and Favara were committed to the common goal of obtaining the fifteen E-Rate contracts, and that both agreed to utilize false financial information to achieve that goal. This is sufficient evidence for the jury to find an agreement existed. *See Montgomery*, 384 F.3d at 1062-63.

**[10]** There was also sufficient evidence that Green had the intent to defraud. Evidence introduced at trial established that Green knew the Alliance had no assets, but that she nonetheless had Favara post the false financial information on its website. Further, Green proposed to make grants to schools to cover their co-pays out of the inflated profits that Expedition Networks would receive from the E-Rate contracts it received. She even submitted falsified letters to USAC informing it of grants that the Alliance had awarded, even though no such grants had been made. This was sufficient to support the jury's finding of intent to defraud.

## C. Bid Rigging (Counts 12-20)

Finally, Green challenges the sufficiency of the evidence on the bid-rigging counts. Viewing the evidence in the light most favorable to the government, we conclude that the evidence at trial easily supported the jury's finding that Green participated in multiple bid-rigging conspiracies.

Section 1 of the Sherman Act provides: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. The section does not prohibit all restraints of trade, but only those that are unreasonable. *United States v. Brown*, 936 F.2d 1042, 1045 (9th Cir. 1991). Generally, the question whether

a restraint of trade is unreasonable involves a detailed factual inquiry. *Id.* This case-by-case analysis is unnecessary, however, "when the restraint falls into a category of agreements which have been determined to be *per se* illegal. Such agreements are those that 'always or almost always tend to restrict competition and decrease output.' " *Id.* (quoting *Northwest Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 289-90 (1985)).

Green does not dispute that bid rigging constitutes an offense that is *per se* illegal. *See United States v. Rose*, 449 F.3d 627, 630 (5th Cir. 2006) ("[C]onspiracies to submit collusive, noncompetitive, rigged bids . . . are *per se* violations of the Sherman Act."); *United States v. Reicher*, 983 F.2d 168, 170 (10th Cir. 1992) ("Bid rigging is [a] per se violation [of the Sherman Act]."). Instead, she claims that she did not engage in bid rigging because the agreements she organized were legitimate teaming agreements among companies that were not competitors. *See United States v. MMR Corp.*, 907 F.2d 489, 498 (5th Cir. 1990) (noting "unremarkable proposition that an agreement not to compete between two parties who are not actual or potential competitors is not per se or otherwise illegal because an agreement not to compete between two parties who are not competitors is meaningless"); *see also Northrop Corp. v. McDonnell Douglas Corp.*, 705 F.2d 1030, 1050-54 (9th Cir. 1983) (concluding that teaming agreement between government contractors warranted analysis under the rule of reason).

**[11]** The government's evidence, however, was sufficient to support the jury's finding that Green engaged in bid rigging. To begin with, the evidence at trial established that Green controlled the bidding process. She informed vendors in advance that they would be selected for E-Rate projects, dictated the contents of their bids, and orchestrated matters so that school districts would award their contracts to her preselected vendors. These actions went beyond merely arranging a team of contractors to create a legitimate bid; they

encouraged that team to fashion its bid without regard to the competition. By interfering with the competitive bidding process in this way, there can be little doubt that Green's actions fell within the heart of the anticompetitive conduct prohibited by the Sherman Act.

**[12]** The government's evidence also established that Green did more than just arrange "teams." Green routinely interfered with arm's length negotiations between contractors, dictating which vendors would act as subcontractors and what portions of the projects they would perform. For example, with respect to count twelve, a project for the West Fresno School District, there was testimony that Green explicitly told two vendors that they would act as subcontractors to her chosen contractor, as well as what portions of the project both vendors would perform. Representatives from both subcontractors testified that their companies had planned to bid on portions of the project directly to the school district until Green told them to act as subcontractor. Thus, these companies were at least potential, if not actual, competitors. Similar evidence supported counts thirteen and twenty. A rational jury could conclude that Green's actions were meant to subvert the competition between these vendors.

The remaining counts all involved an agreement executed between two vendors where the larger, NEC, would act as prime contractor, and the smaller, VNCI, as subcontractor, on all bids the two acquired. Green claims that VNCI and NEC were not true competitors because VNCI was too small and underfunded to act as the primary contractor. Yet there was evidence introduced at trial that VNCI served as the prime contractor on at least one other E-Rate project. From this evidence, a rational jury could have concluded that VNCI had the capability of serving as the prime contractor, and thus was a potential competitor, for this, as well as other projects.

**[13]** The above evidence was more than sufficient for a rational trier of fact to convict Green of bid rigging. Accordingly, we affirm her conviction on those counts.

## III.  Vicarious Liability Instruction

Green also challenges the district court's vicarious liability instruction. The instruction read as follows:

> For defendant to be guilty of an offense committed by a coschemer in furtherance of the scheme, the offense must be one that could be — could reasonably be foreseen as a necessary and natural consequence of the scheme to defraud.
>
> Many of the faxes and e-mails alleged in the counts to have been wirings were sent by individuals not claimed to have been a coschemer. It is not necessary, however, that the government prove the sender was a coschemer so long as the government proves beyond a reasonable doubt that defendant or a coschemer knew or could have reasonably foreseen that the e-mail or fax in question would be sent to carry out an essential part of the alleged scheme.

Green takes issue with two aspects of this instruction. She argues that the instruction: (1) erroneously stated that the wire transmission need not have been sent by a co-schemer; and (2) erroneously failed to restrict Green's criminal liability to what was reasonably foreseeable to her. We review *de novo* "the question whether a trial court's jury instruction omitted or incorrectly described an element of the offense." *United States v. Thongsy*, 577 F.3d 1036, 1040 (9th Cir. 2009).

Green's first point is incorrect. The Supreme Court long ago foreclosed the argument that the wire must be sent by a member of the scheme to defraud. In *Pereira v. United States*, 347 U.S. 1 (1954), the defendant seduced and married a wealthy woman by purporting to be "the owner and operator of several profitable hotels." *Id.* at 3-5. After the wedding, the defendant convinced his new wife to lend him $35,000 that he claimed he would use as an advance on the purchase price of

a new hotel. *Id.* at 5. Once he received the check, the defendant cashed it and fled. *Id.*

**[14]** The defendant was convicted of mail fraud, but challenged his conviction on the ground that he had not made any mailing; the mailing underlying his conviction was a check sent from a bank in El Paso, Texas, to a bank in Los Angeles. *Id.* at 8. The Supreme Court rejected his argument: "To constitute a violation of these provisions, it is not necessary to show that petitioners actually mailed or transported anything themselves; it is sufficient if they caused it to be done." *Id.* at 8; *see also id.* at 8-9 ("Where one does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended, then he 'causes' the mails to be used."); *Schmuck*, 489 U.S. at 711-712 (affirming conviction for mail fraud where mailing was sent by defrauded car dealerships).

**[15]** Green's second point is more viable. A participant in a scheme to defraud is liable for "acts of mail or wire fraud committed by co-schemers," provided those acts took place "during the life of the scheme and . . . were reasonably foreseeable as a necessary and natural consequence of the fraudulent scheme." *United States v. Stapleton*, 293 F.3d 1111, 1118-19 (9th Cir. 2002). In the mail and wire fraud context, we have not previously articulated the standard for "reasonable foreseeability." We agree with Green that foreseeability must be evaluated according to the facts that were known to the defendant.

We have been unable to find a case that reaches this conclusion in the wire fraud context. In the related realm of conspiracy, however, it appears to be an established rule, although it is rarely discussed. *See*, *e.g.*, *United States v. Casiano*, 113 F.3d 420, 427 (3d Cir. 1997) ("Thus, the issue is whether there was sufficient evidence that Casiano could have reasonably foreseen the use of a gun by his co-

conspirators."); *United States v. Hernandez*, 509 F.3d 1290, 1298 (10th Cir. 2007) ("It is well established that, '[u]pon [his] conviction of conspiracy to possess with intent to distribute [marijuana], [Mr. Hernandez] was accountable for that drug quantity which was within the scope of the agreement and reasonably foreseeable to [him].' " (quoting *United States v. Arias-Santos*, 39 F.3d 1070, 1078 (10th Cir. 1994)) (alterations in original)).

We implicitly reached this conclusion while discussing co-conspirator liability in *United States v. Castaneda*, 9 F.3d 761 (9th Cir. 1993), *overruled on other grounds by United States v. Nordby*, 225 F.3d 1053, 1059 (9th Cir. 2000). *Castaneda* involved a conspiracy to distribute cocaine and heroin in which Uriel Castaneda was a supplier, and his wife, Leticia Castaneda, held a minor role. *Id.* at 763. Leticia Castaneda, like the other members of the conspiracy, was prosecuted for seven counts of possessing a firearm in connection with a drug-trafficking crime. *Id.* at 763-64; *see also* 18 U.S.C. § 924(c). The predicate offense for one of these counts was the overarching conspiracy to distribute drugs itself; the remaining counts were based upon other conspiracy members' use of firearms at the time they possessed drugs with intent to distribute. *Id.* at 764-66.

Although we affirmed the possession convictions of the other defendants, we concluded that Leticia Castaneda had such a "marginal role" in the conspiracy that *she* could not reasonably have foreseen the details of her co-conspirators' actions: "[G]iven Leticia's lack of participation in the conspiracy and her lack of involvement with the predicate offenses, the use of firearms by the other conspirators in relation to these offenses was not reasonably foreseeable to her." *Id.* at 767-68. We therefore vacated all of her convictions except the one that had as its predicate offense the conspiracy as a whole. *Id.*

**[16]** *Castaneda* therefore established that vicarious liability must be predicated on acts that were reasonably foresee-

able to the defendant. Although it was decided in the context of a conspiracy, we believe its holding applies equally in the context of mail and wire fraud. Indeed, courts have long remarked upon the similarities between a conspiracy and the "scheme to defraud" element of mail fraud. *See*, *e.g.*, *Stapleton*, 293 F.3d at 1116-17; *United States v. Lothian*, 976 F.2d 1257, 1262-63 (9th Cir. 1992).

**[17]** Under this standard, the district court's foreseeability instruction was incorrect. As is plain from the instruction, the jury was allowed to convict Green based upon what was reasonably foreseeable not only to her, but also to her co-schemers. No portion of the district court's instructions corrected this error.

**[18]** Although the instruction was erroneous, that is not the end of our inquiry. We must next determine whether the error was harmless. *See Hedgpeth v. Pulido*, 129 S. Ct. 530, 530-32 (2008) (per curiam) (holding instructional error is subject to harmless error review); *United States v. Smith*, 561 F.3d 934, 938 (9th Cir. 2009) (en banc) (holding instructional error to be "[n]on-structural constitutional error[ ]" and "therefore subject to harmless error review"). As the trial court noted, and as detailed below, the evidence was overwhelming that Green was at the center of each of the fraudulent schemes. Unlike in *Castaneda*, Green's involvement in the schemes was not "marginal." She was aware of and intricately involved in every scheme charged in the indictment. Further, each of the wires identified in the indictment were routine emails or faxes made in furtherance of the schemes; they fell well within the range of ordinary communications to be expected in the course of bidding on and procuring a government contract.

**[19]** Accordingly, while the district court's instruction may have misstated the proper standard of reasonable foreseeability, any error was harmless beyond a reasonable doubt. *See United States v. Anchrum*, 2009 WL 5125788, *4 (9th Cir.

2009) ("A jury instruction error is harmless if it is ' "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." ' " (quoting *United States v. Gracidas-Uliberry*, 231 F.3d 1188, 1197) (9th Cir. 2001) (quoting *Neder v. United States*, 527 U.S. 1, (1999))).

## IV.   Ninety-Month Sentence

Green's final contention is that her ninety-month sentence was "unreasonable and unconstitutionally disparate from that of similarly situated defendants." Given that Green has not alleged that her sentencing suffered from any procedural error, we review for "substantive reasonableness, considering the totality of the circumstances." *United States v. Higuera-Llamos*, 574 F.3d 1206, 1211 (9th Cir. 2009).

[20] The district court's ninety-month sentence was well within the range of reasonableness. There was ample justification for Green receiving a more severe sentence than her co-schemers. The evidence produced at trial established that Green was the ringleader and driving force behind the fraudulent schemes: she approached the school districts, she orchestrated the bidding process, and she dictated the equipment that would be included in the projects. At sentencing, Green even conceded a four-point organizer enhancement. This was sufficient to justify her more severe sentence. *See*, *e.g.*, *United States v. Carter*, 560 F.3d 1107, 1121 (9th Cir. 2009) (finding that disparities in sentences among co-conspirators did not make sentences unreasonable because the defendants were not similarly situated).

[21] We also reject Green's argument that her sentence was unreasonable in light of her age and background; the trial judge expressly took those circumstances into account when imposing her sentence. Despite the fact that he believed a sentence in the Guidelines range of 97-121 months was appropriate for the crimes Green committed, he departed downward in

light of both of the above factors. Further, the trial judge had already been lenient in his Guidelines calculations, resulting in a Guidelines range that was significantly lower than that which Green may have deserved. In short, the trial judge fairly and carefully crafted Green's sentence, taking into consideration the circumstances Green raises on appeal.

Finally, Green's contention that her sentence was more severe than those received by defendants in other E-Rate cases also does not render her sentence unreasonable. Indeed, her sentence was below the low-end of the Guidelines range, and the Guidelines range exists to ensure national uniformity in sentencing. *United States v. Saeteurn*, 504 F.3d 1175, 1181 (9th Cir. 2007); *see also United States v. Becerril-Lopez*, 541 F.3d 881, 895 (9th Cir. 2008) ("[W]e have trouble imagining why a sentence within the Guidelines range would create a disparity, since it represents the sentence that most similarly situated defendants are likely to receive."); *United States v. Carty*, 520 F.3d 984, 988 (9th Cir. 2008) (en banc) ("[W]e recognize that a correctly calculated Guidelines sentence will normally not be found unreasonable on appeal.").

The record reveals that the experienced trial judge conducted a detailed examination of the Sentencing Guidelines and carefully considered Green's particular circumstances before imposing sentence. We therefore conclude that Green's sentence was not unreasonable.

## CONCLUSION

For the foregoing reasons, the judgment of conviction and the sentence are **AFFIRMED**.